Frank T. STEWART, Joseph Lepine, Cal Berry, Stanford Caillouet, Sr., Rayfield Lewis, Eddie Williams, and Garland Weber, Petitioners,

v.

The PARISH SCHOOL BOARD OF the PARISH OF ST. CHARLES, and School District No. 1 of the Parish of St. Charles, Respondents.

Civ. A. No. 69–2818.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Feb. 25, 1970.

Wilmer G. Hinrichs, New Orleans, La., for plaintiffs.

Norman J. Pitre, Luling, La., Melvin P. Barre, Dist. Atty., 29th Judicial District, Edgard, La., E. E. Huppenbauer, Jr., J. Hugh Martin, Harold Judell, New Orleans, La., William P. Schuler, Asst. Atty. Gen., for defendants.

Before WISDOM, Circuit Judge, and CASSIBRY and MITCHELL, District Judges.

WISDOM, Circuit Judge:

This case involves the right to vote in a school bond election.

Louisiana laws, unlike the laws of thirty-six states, restrict eligibility to vote in bond elections to qualified voters who are "property taxpayers".[1] In

---

1. "Municipal corporations, parishes and school, road, subroad, sewerage, drainage, subdrainage (waterworks and sub-water-works) districts, hereinafter referred to as subdivisions of the State, may incur debt and issue negotiable bonds, when authorized by a vote of a majority in number and amount, of the property tax-

such elections the affluence of the voter is made the electoral standard by a requirement *no other State* imposes on the electorate: Political subdivisions in Louisiana may issue bonds only if they are approved by a "majority in number and *amount of the property*" of the taxpayers who vote in the election.[2] These laws deny the vote to parents, lessees, and others who have a direct and substantial stake in public education generally and in the proposition put to a vote, but by necessity or choice do not own real estate in the political subdivision where the election is held.[3] By gearing the weight of each elector's vote to the amount of his assessed property the laws debase the vote of small landowners. We hold therefore that the exclusion of all non-property taxpayers and the dilution of the small property holder's vote violate the Equal Protection Clause of the Fourteenth Amendment.

\* \* \*

The parties have stipulated the facts and have agreed to submit the case to the Court to be "disposed of on the matter of the issuance of a permanent injunction, the parties waiving their respective interests to a hearing on a temporary injunction".

The St. Charles Parish School Board on September 23, 1969, conducted a special election to decide whether the Parish School Board should be authorized to issue bonds to the amount of $5,250,000 for capital acquisition and improvement of public schools in the parish.[4] There

payers qualified to vote under the Constitution and laws of this State, who vote at an election held for that purpose after notice published or posted for thirty (30) days in such manner as the Legislature may prescribe, and the governing authorities of such subdivisions shall impose and collect annually, in excess of all other taxes, a tax sufficient to pay the interest annually or semi-annually and the principal falling due each year, or such amount as may be required for any sinking fund necessary to retire said bonds at maturity." Constitution of 1921, Art. XIV, § 14(a)..

"Only property taxpayers qualified as electors under the constitution and laws of this State are entitled to vote in any election held under the provisions of this Part. The qualifications of taxpayers as voters are those of age, residence, and registration as voters, without regard to sex. There shall be no voting by proxy." LSA-R.S. 39:508.

Thirteen states, besides Louisiana, restrict voting in bond elections to property taxpayers: Alaska Constitution, Article V, Section 1; Arizona Constitution, Article 7, Section 13, A.R.S.; Colorado Constitution, Article XI, Sections 6, 7 and 8; Florida Constitution, Article IX, Section 6, F.S.A.; Idaho Constitution, Article VIII, Section 3; Michigan Constitution, Article II, Section 6; Montana Constitution, Article IX, Section 2; New Mexico Constitution, Article 9, Section 12; New York Local Finance Law, McKinney's Consol.Laws c. 33–a, Section 33.10; Oklahoma Constitution, Article X, Section 27; Rhode Island Constitution,

Amend. Article XXIX, Section 2; Texas Constitution, Article 6, Section 3a, Vernon's Ann.St.; Utah Constitution, Article XIV, Section 3.

2. That is, "their votes must also represent a majority of the assessed property owned by those taxpayers who are actually voting". Cipriano v. City of Houma, 1968, 395 U.S. 701 at 703, fn. 2, 89 S.Ct. 1897, at 1899, 23 L.Ed.2d 647.

3. We take judicial notice of the fact that in Louisiana few individuals pay any personal property taxes; those who do pay a nominal tax usually based on the value of their automobile. Louisiana law, however, provides that "all properties situated—within the state \* \* \* shall be subject to taxation". LSA-R.S. 47:-1951–1956. Tax assessors in this state primarily place business, commercial, and corporate *personal* property (merchandise inventory) on the assessment rolls. Considerable personal property is exempt from taxation. Article 10, Section 4 of the Louisiana Constitution. In effect, the term "property taxpayer" equates with the term "real property taxpayer" or "landowner".

4. The proposition submitted to the resident property taxpayers of the School District read as follows:
    Shall School District No. 1 of the Parish of St. Charles, State of Louisiana, incur debt and issue bonds to the amount of Five Million Two Hundred Fifty Thousand Dollars ($5,250,-000.00), to run twenty-five (25) years from date thereof, with interest at a rate not exceeding six per centum (6%)

are 10,275 registered voters in the Parish; 7808 are white and 2421 are Negro voters. The election was hard fought, perhaps because residents on one side of the Mississippi River were at odds with residents on the other side of the River.[5] (All of the plaintiffs reside on the East bank.) Despite the public interest in the election, only 2,385 electors voted.[6] The official tabulation showed that 1,271 voters, representing an assessed valuation of $1,650,168.50, voted in favor of authorizing the bond issue; 1,114 voters, representing an assessed valuation of $1,261,310, voted against the bond issue. The bond issue was approved therefore by a majority of 157 votes in number presumably representing an assessed valuation of $388,858.30.

The plaintiffs brought this action on November 21, 1969, against the Parish School Board and School District No. 1, the sole and parish-wide school district in St. Charles Parish, to set aside the election and to enjoin the defendants from offering or selling the bonds.

The plaintiffs fall into two classes: (1) non-property taxpayers, who were ineligible to vote and (2) property taxpayers, who were eligible to vote but whose assessments were less than the assessments of others who voted in the election. In each class some of the plaintiffs have children enrolled in the public schools in St. Charles Parish; some do not.

## I.

Certain principles involving voting rights apply to elections across the board. The one man, one vote canon of Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, is such a principle: it bars dilution of the franchise. Avery v. Midland County, 1968, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45, extends the Reynolds v. Sims canon to subdivisions of a state including, of course, school districts. In Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, the Court, striking down the poll tax, concluded: "[S]tate law violates the Equal Protection Clause * * * whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax! * * * Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race * * * are traditionally disfavored." These three decisions are basic to our conclusions in this case.

per annum, for the purpose of acquiring and/or improving lands for building sites and playgrounds, including construction of necessary sidewalks and streets adjacent thereto; purchasing, erecting and/or improving school buildings and other school related facilities within and for said School District, and acquiring the necessary equipment and furnishings therefor, title to which shall be in the public?

5. An editorial from the St. Charles Herald, September 4, 1969, made part of the complaint, states: "Actually, the board plans to build one new high school on the West Bank. Any money left over will be used to build facilities at the GATX school that were supposed to be built at Norco, Destrehan and St. Rose out of money from the last bond issue. ¶ There is no doubt that the schools in St. Charles

parish need the five and a quarter million dollars. ¶ There is also no doubt that the expenditure of this money in St. Charles by the present superintendent's office will mean that politics, not pure educational needs, will be served by the money." An editorial from the Herald dated September 25, 1969, states: "West Bank voters, who will receive almost all of the bond issue, voted to build a central high school on their side of the river. * * * No single precinct on the East Bank favored the bond issue."

6. The record does not indicate the number of non-property taxpayers registered to vote in St. Charles Parish. The disparity between the total number of registered voters and the number of votes cast in the election suggests that a large number of registrants were ineligible to vote in the election.

## II.

Two recent decisions of the Supreme Court control this case: Kramer v. Union Free School District, 1969, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583, and Cipriano v. City of Houma, 1969, 395 U. S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647.

In *Kramer* the Court considered a New York statute limiting the vote in local school board elections to parents and guardians of children attending public schools in the district and to residents who owned or leased taxable real property. The defendants contended that parents and guardians constituted a group "primarily" interested in school affairs, an interest not shared by the public generally. In *Kramer,* as in the case before this Court, the School District and the State contended that property owners and lessees of taxable property had a special interest in decisions affecting public schools, since the funds for such schools were derived almost entirely from the taxes paid on real property. The three-judge district court held that restricting voting to these two groups was "rational" and "within the limits of the State's power to fix" qualifications for voting. The court characterized the election of a school board as a special purpose election, distinguishing *Harper* which involved a general election. 282 F.Supp. 70 (E.D.N.Y.1968), on remand from 379 F.2d 491 (2nd Cir. 1967).

The Supreme Court, in a five to three opinion by Chief Justice Warren, held that the voting qualifications denied equal protection to the excluded voters. The Court pointed out, quoting from Reynolds v. Sims, that state statutory and constitutional provisions prohibiting the exercise of the voting franchise to some electors, while allowing it to others, must be "carefully and meticulously scrutinized" [7] to determine "whether the exclusion[s] [are] necessary to promote

a compelling state interest".[8] The Court found that the restrictions imposed by the New York statute "[did] not meet the exacting standard of precision we require of statutes which selectively distribute the franchise. The classifications * * * permit inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions".[9] The Court said: "The issue is not whether the legislative judgments are rational. A more exacting standard obtains. The issue is whether the * * * requirements do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class." Are those excluded "substantially less interested or affected than those the statute includes? In other words, the classifications must be tailored so that the exclusion of appellants and members of his class is necessary to achieve the articulated state goal."[10]

In *Cipriano* the law under attack was identical with the pertinent provisions under attack in the instant case in that it gave only "property taxpayers" the right to vote in elections called to approve an issue of revenue bonds by a municipal utility. The district court accepted the argument that because of the "special pecuniary interest" property owners have in a utility system the classification was a "rational" one. On the facts, the Supreme Court might have held that the classification failed to meet the test of rationality. Instead, the Court reiterated the exacting *Kramer* standard: The "Court must determine whether the exclusions are necessary to promote a compelling state interest".[11] The voting restriction failed to meet that test.

In *Kramer* and *Cipriano* the Court declared that it was unnecessary to decide

---

7. 395 U.S. at 626, 89 S.Ct. at 1889.

8. 395 U.S. at 630, 89 S.Ct. at 1891.

9. 395 U.S. at 632, 89 S.Ct. at 1892.

10. 395 U.S. at 632, 89 S.Ct. at 1892.

11. 395 U.S. at 704, 89 S.Ct. at 1890.

whether a state might in some circumstances limit the franchise to those "primarily interested". But the standard established in those cases cannot be confined within the contexts of a school board election, which the defendants characterize as a "political" election, and a revenue bond election, which the defendants characterize as "proprietory" in nature. Thus, in *Kramer* the Court said: "Our exacting examination is necessitated not by the subject of the election; rather, it is required because some resident citizens are permitted to participate and some are not." 395 U.S. at 629, 89 S.Ct. at 1891.

*Kramer* and *Cipriano*, with the aid of Reynolds v. Sims, *Avery*, and *Harper*, teach that laws restricting the right to vote—we say, in any election—do not carry the usual presumption of constitutionality. In other situations, for example, a graduated tax, the defenders of a statutory classification have the light burden of finding that the legislative scheme has a rational basis.[12] Here they must meet "the exacting standard of precision" required of "statutes which selectively distribute the franchise". Here the Equal Protection Clause is not satisfied by a finding that it was reasonable to recognize the special interest property owners have in a bond issue; the laws are unacceptable if they exclude non-property electors who have a substantial stake in the result of the election. It has been suggested that in *Kramer* the Court "conflat[ed] objective stake with subjective concern", signalling that, "even if a test could. select for objective stake, it is not acceptable to exclude those concerned about the outcome even if they have no stake in the

election. * * * A significant result of this reading of *Kramer* is that property qualifications *simpliciter* may no longer be acceptable eligibility tests, even in such traditional areas as school millage or sewer assessment elections. It would make no difference that a community's tax structure was such that only property owners directly paid for such proposals. The Court's concept of 'interest' will not permit the exclusion of residents who do not own property, since they share a concern for and stake in the quality of the schools the young attend and the operation of the sewers which make the city habitable." Comment, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 7, 80–81 (1969).

In *Kramer* the Supreme Court noted that the effect of the New York statute was to disfranchise "appellant and others who similarly live in their parents' homes * * * (unless they are parents or guardians of children enrolled in the district public school): senior citizens and others living with children or relatives; clergy, military personnel, and others who live on tax-exempt property; boarders and lodgers; parents who neither own nor lease qualifying property and whose children are too young to attend school; parents who neither own nor lease qualifying property and whose children attend private schools". 395 U.S. at 630, 89 S.Ct. at 1891, 23 L.Ed.2d 583. These are all groups of persons who are excluded by Louisiana law from participating in any bond elections. Indeed, in a school bond election, Louisiana law is even more restrictive than the New York law which recognizes that lessees [13] and parents and

12. *Harper* and the redistricting cases presage "a preferred position for voting rights as key or fundamental rights, somewhat analogous to the special position now afforded to first amendment rights". A. Kaplan, Note, 4 Harv.Civ. Lib.L.Rev. 431, 442 (1969). The equal protection clause has a "positive aspect" in the area of voting rights. Note, 55 Va.L.Rev. 559 (1969).

"Equal protection requires a higher standard for classifications denying or

diluting a citizen's vote than has traditionally been required for legislative classifications involving less fundamental political matters." Kramer v. Union Free School Dist., 282 F.Supp. 70, 81 (1968). (J. Weinstein, dissent).

13. The contention that in a bond election property taxpayers are more likely to vote responsibly than non-property owners rests on the assumption that only property owners pay the property tax. This

guardians of children in public schools have, "objectively", a "direct" stake in school affairs. 395 U.S. at 631, 89 S.Ct. 1886. Subjectively, parents and guardians have a special concern that the schools their children attend will be improved and properly maintained. They are in a position analogous to that of the non-property owners in Houma who pay utility bills and are directly affected by the operation of the utility systems. *Cipriano,* 395 U.S. at 705, 89 S.Ct. 1897, 23 L.Ed.2d 647.

There is a recent sequel to *Kramer* and *Cipriano* involving the constitutionality of a Georgia law limiting school-board membership to freeholders. Turner v. Fouche, January 19, 1970, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567. "Without excluding the possibility that other circumstances might present themselves in which a property qualification for office-holding can survive constitutional scrutiny," the Supreme Court held that the freeholder requirement for membership on the county board of education amounted to invidious discrimination. "It cannot be seriously urged that a citizen in all other respects qualified to sit on a school board must also own real property if he is to participate responsibly in educational decisions, without regard to whether he is a parent with children in the local schools, a lessee who effectively pays the property taxes of his lessor as part of his rent, or a state and federal taxpayer contributing to the approximately 85% of the Taliaferro County annual school budget derived from sources other than the board of education's own levy on real property. Nor does the lack of ownership of realty establish a lack of attachment to the community and its educational values. However reasonable the assumption that those who own realty do possess such an attachment, Georgia may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold. Whatever objectives Georgia seeks to obtain by its 'freeholder' requirement must be secured, in this instance at least, by means more finely tailored to achieve the desired goal." Turner v. Fouche, 396 U.S. at 364, 90 S. Ct. at 542.

There are obvious differences between the case before the court and *Kramer, Cipriano,* and *Turner.* It is significant, however, that in none of the cases did the Supreme Court recognize a constitutional difference between a general election and a special-purpose election. In the recent case of Kolodziejski v. City of Phoenix, Nov. 17, 1969, D.C.Ariz., a three-judge court considered Arizona constitutional and statutory provisions limiting the electorate in bond elections to real property taxpayers.[14] The court could "find no evidence which would justify a distinction between Revenue Bonds and General Obligation Bonds". Going "no further" than *Kramer* and *Cipriano,* the court held that there was "no evidence" to "justify the conclusion that the exclusions under Arizona law are necessary to promote a compelling State interest". *Contra:* Settle v. City of Muskogee, Okl., Dec. 23, 1969, 462 P.2d 642; Settle v. Board of Commissioners, Co. of Muskogee, Okl., Dec. 23, 1969, 462 P.2d 646; Muench v. Paine, Idaho, 463 P.2d 939.

The State's compelling interest in fixing the qualifications of voters in school

---

assumption is false, for the tax is passed on to tenants in the form of rent. "Contrary to popular misunderstanding, a renter pays just as much in property taxes as an owner, although it is hidden in the rent." C. Adrian & C. Press, Governing Urban America, 90 (1968). The transiency of tenants as a factor in determining interest is taken into account by residence qualifications for voting.

14. The proposition voted on in the *Kolodziejski* case included both revenue bonds and ad valorem or general obligation bonds. The purpose was to improve water systems, airport facilities, sewer systems, parks and playgrounds, municipal buildings, fire, police, public safety, library, sanitary landfills, and maintenance and service facilities.

bond elections is to delegate to the voters in each school district the authority to improve public education in their district. That objective is certainly not promoted by excluding parents and guardians of school children and others who cannot be characterized as having a substantially less interest in public education than property taxpayers. In terms of the effect of the St. Charles election, the excluded groups may be more seriously affected than the taxpayers, many of whom may have a proper interest in avoiding arbitrary taxes but little or no interest in public schools. The State's objective of improving public education could, of course, be frustrated if a small minority of property taxpayers turned against the public school system.[15] That objective might also be frustrated if a majority of all voters reacted against public education. But a republican form of government, at least in today's world, rests on widening the suffrage and faith in the democratic process.

True, the school bonds are secured by ad valorem taxation. Property taxpayers are faced with additional taxes for the years authorized by the bond issue; they are subject to having a lien on their property for the life of the issue. But if protection of the property taxpayer had been the legislature's chief interest, the law would not have excluded business entities. These are the taxpayers who pay the largest share of taxes in most voting districts.

The presumption that property owners are more competent to vote in a bond election than non-property owners leads to irrational results. "It would disfranchise the president of a bank who happened to rent rather than own his own home."[16] All residents of a school district have an interest in public education. Here, for example, the general public interest must be weighed against allowing a particular private group to decide whether a public school be built and where—according to the School Board's pre-election announcements. The location of a new school may have a decisive effect on continuing or diminishing school segregation. In rural areas and in cities, to a lesser extent, the local high school is the focal point for community activities. Federal and state funds supply substantial aid to public education. All taxpayers contribute to these funds, but under the challenged law the decision to finance through a bond issue the construction of new schools and improvement of old schools is delegated to landowners.

Thirty-six states have not considered property a necessary qualification for voting in a bond election.[17] These states rely on checks and balances to prevent

15. The amicus brief of the Louisiana School Boards Association, however, makes the point that: "The property owning citizens of Louisiana have consistently supported their local school systems in their communities by providing the capital improvement revenues needed to build, equip, and maintain the buildings in which the children must be housed in order to be properly educated. Historically, this burden of providing the buildings and equipment for the education of our children has been placed upon the shoulders of the property owning taxpayer. An examination of our sixty-six local public school systems will show clearly that the property owning taxpayers have willingly shouldered this burden in spite of opposition from segments of labor, conservatives, liberals and particularly against those who would pay no taxes at all."

16. Note, 55 Va.L.Rev. 559, 566 (1969).

17. No state today has property qualifications for voting in general elections. XVII Council of State Governments, The Book of the States, 1968–69, 30 (1968). "In time [however] leveling influences prevailed, and most Americans refused to accept the contention that there was a necessary relationship between property ownership or payment of taxes and interest in government or capacity to govern. North Carolina, in 1865, was the last state to abolish property ownership as a qualification for voting in state and national elections. * * *" Phillips, Municipal Government and Administration in America 175 (1960).

arbitrary and excessive taxation. Similar controls exist in Louisiana which make the exclusions unnecessary. (1) The Louisiana Constitution limits bonded indebtedness. La.Const. of 1921, Art. XIV, § 14. (2) Before a School District can call a special election to incur bonded indebtedness, the approval of the State Board and Tax Board must be obtained. LSA–R.S. 47:1804. The Board is composed of the Governor, Secretary of State, Attorney General, Legislative Auditor, and the Secretary of the Board appointed by the Governor. In National Bank of Commerce in New Orleans v. Board of Supervisors, 1964, 206 La. 913, 20 So.2d 264, the Louisiana Supreme Court pointed out that the Board has (a) the discretion and authority to prohibit the incurring of excessive debts, the levying of burdensome taxes, the excessive mortgaging of property and the excessive and unwarranted pledging of revenues in the interest of protecting the public fisc and the full faith and credit of the State and its political subdivisions, and (b) the function and duty to investigate and find the facts and circumstances affecting each individual case before deciding whether the application should be granted or denied.

It must also be kept in mind that the electorate, whether it be the property-taxpayer electorate, as now, or the general electorate as urged by the plaintiffs, has no authority under Louisiana law to initiate any proposal to incur debt or issue bonds. That initiating authority resides in the legislative process delegated to the parish and local school boards (and other political subdivisions with bonding authority). In this governmental process the basis for controls against any abusive assault on the property taxpayer is the responsiveness of elected officials, such as the school board members of the defendant board, to the will of the electorate as a result of having to offer themselves for election and reelection, and by being subject to recall.

### III.

Other characteristics of the challenged Louisiana law demonstrate that it does not meet the exacting standards of *Kramer* and *Cipriano*.

The requirement that the bond issue be approved by a majority of the taxpayers voting representing a "majority of the assessed property owned by those taxpayers who are actually voting" apparently rests on the assumption, first, that property owners have a special pecuniary interest; second, that the larger the assessment the greater the interest and the greater the need to protect large property owners from irresponsible owners having no property. *Kramer* and *Cipriano* cut through the basic assumption. It is not enough to show that included groups have an interest. It must be shown that the exclusions are necessary to promote a compelling state interest. In terms of voting responsibly, there is no necessary correlation between the amount of an assessment and the degree of interest a taxpayer may have in a particular bond issue. A ten thousand dollar house to one person may mean more to that person than a hundred thousand dollar house to another.

The actual effect of gearing assessments to the vote is simply to dilute the participation of small landowners and to exaggerate the participation of large landowners in violation of the one man, one vote canon.[18] In a small rural par-

18. *Cf.* Lance v. Board of Education of County of Roane, W.Va.1969, 170 S.E.2d 783, reh'g denied. The Supreme Court of Appeals held, inter alia, that the three-fifths vote requirement of the West Virginia Constitutions and statutes dealing with bond elections was unconstitutional. The effect of the requirement is "to debase or dilute the weight or force of an af- firmative vote when considered in relation to the weight or force of a negative vote". The Court relied on *Kramer*, *Cipriano*, and *Harper*, among other decisions. The Court said: "We are of the opinion that the 'one person, one vote' principle is now firmly established in broad general terms without qualification or exception. Certainly the right of

ish these effects are especially conspicuous. This is a type of invidious discrimination condemned in *Harper*: "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. * * * To introduce wealth or payment of a fee as a measure of a voter's qualification is to introduce a capricious or irrelevant factor." 383 U.S. at 668, 86 S.Ct. at 1082, 16 L.Ed.2d 169.

Basing the vote on the tax assessment produces anomalous results stemming from the homestead exemption. A homeowner is entitled to an exemption of either $2,000 or $5,000 of the assessed value of his home, depending on whether he is a veteran.[19] Of course, a significant number of individual property owners enjoy this exemption and pay taxes only on the excess valuation. All of these homeowners are permitted to vote the full value of their assessment whether in fact they pay little or no taxes. The result is that this group of homeowners vote but pay no more taxes than the plaintiffs who own no property.

The State reimburses school boards and other political subdivisions from the State Property Tax Relief Fund for the loss of taxes represented by the total assessed value of the homestead exemption. This fund is made up of the Public Utilities Tax,[20] the Alcoholic Beverage Tax,[21] and the State Income Tax.[22] Thus, a substantial amount of the voters' ad valorem property taxes is actually paid by the Property Tax Relief Fund.[23] All taxpayers, therefore, contribute to the property tax but only those who own assessed property may vote in school bond elections.

## IV.

There are two constitutional issues in this case: first, the restriction of the franchise to property taxpayers; second, the requirement that the majority of the voters represent a "majority of the assessed property". Since the Court agrees with the plaintiffs on the first issue, it might be said that it is unnecessary to reach the second issue. But the two limitations have been inseparable since 1898. Moreover, weighting the vote in favor of the large property owner points up the unsoundness of limiting the vote to property taxpayers. If this limitation were constitutional, the same arguments supporting its constitutionality would support basing the election on the value of a voter's assessment.[24] It is conceivable that in a small rural school district a handful of taxpayers would have the veto power over public school improvements. In any voting district, the small homeowner would have his vote diluted. At this point in history, this is an intolerable discrimination.

the voter to equal protection, the right to protection against the dilution or debasement of the weight or force of an individual's vote, is fully as sound, sacred and important when he is voting on issues involving taxation, public revenue and the promotion of an adequate public school system, as when he is voting for the nomination or election of a constable, a state senator, a governor or any other public official to represent the voter in government. ¶ We are unwilling to concede that a determination of issues such as those involved in this case cannot be safely entrusted to a majority of the voters."

19. La.Const. of 1921, Art. X, § 4, pars. 9, 9(a), 9(b); LSA–R.S. 39:253.

20. LSA–R.S. 47:1009, 1010.

21. LSA–R.S. 26:460.

22. LSA–R.S. 47:284, 285.

23. The homestead exemption is, of course, not a part of the law now being challenged. We should also point out that the Property Tax Relief Fund is under the legislature's control both as to sources of revenues deposited to its credit and eligibility to share in it proceeds. The plaintiffs do not attack the validity per se of voting homestead exempt property. They argue that the state's allowing such property to be voted demonstrates that the state's compelling interest here was not simply to protect "taxpayers".

24. Indeed, in their brief the defendants argue that the requirement of a majority in the amount of assessment is an "equitable voting procedure in an election whose participants are limited to property owners".

In short, we hold in favor of the plaintiffs on both issues. The special interest property taxpayers have in bond elections is not the compelling State interest that would justify excluding a large portion of the electorate that has a substantial stake in public education.[25]

▄ We hold that the general election laws of Louisiana are to be applied in general obligation bond elections; all qualified registered voters are entitled to vote in such elections, as they are now entitled to vote in Louisiana revenue bond and sales tax elections.

We do not reach the question whether the secrecy of the ballot is a constitutional principle and whether the method of voting assessments violates that principle.

### V.

▄ Significant hardships would be imposed on political subdivisions, bondholders and others connected with the financing of local government if our decision today was given full retroactive effect. Where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis for avoiding injustice or hardship by a holding of non-retroactivity. *See* Cipriano v. City of Houma, 1969, 395 U.S. 701, 89 S.Ct. 1897, 23 L. Ed.2d 647 and the authorities therein cited. Elections for approval of bonds and special taxes have been held in good faith by many public bodies as required by state law, and as a result budgets have been adopted and obligations incurred in reliance upon such elections. To upset these elections would disrupt orderly government and would not be in the public interest. Therefore, we hold that this decision should be applied prospectively: only to elections held after the date this decision becomes final and to those elections held prior to such date that are challenged during the time period specified by Louisiana law for challenging the election. Of course, our decision will not affect the validity of bonds or other securities which have been issued and are now outstanding.

### JUDGMENT

It is ordered that Article 14, Section 14(a) of the Constitution of the State of Louisiana and Title 39, Section 508 of the Revised Statutes of the State of Louisiana are violative of the Fourteenth Amendment of the United States Constitution insofar as said provisions of law restrict elections to property taxpayers who are otherwise qualified electors of the political subdivision, and insofar as said provisions of law require the weighing of the vote cast in the amount of the assessed valuation voted.

It is further ordered that the special election held on September 23, 1969, pursuant to the resolution adopted by the Parish School Board of the Parish of St. Charles, acting as the governing authority of School District No. 1 of the Parish of St. Charles on July 28, 1969, be and the same is hereby declared to be null and void and to have no force and effect.

It is further ordered that all of the Defendants, their successors, agents, or attorneys be and they are hereby permanently enjoined from taking any further action to advertise, issue, sell, or deliver any bonds purported to have been authorized by the said special bond election held on September 23, 1969, and from levying any ad valorem tax under the authority of said election.

25. In *Kramer* the Court noted that in school elections "objective" stakes are held by parents, future employers, neighbors, and in the sense that a nation's progress depends on its young, all citizens. The Court, however, also regarded "subjective" concern as relevant: "[A]ppellant resides with his parents in the school district, pays state and federal taxes and is interested in and affected by school board decisions; however, he has no vote. On the other hand, an uninterested unemployed young man who pays no state or federal taxes, but who rents an apartment in the district, can participate in the election." 395 U.S. at 632, fn. 15, 89 S.Ct. at 1892, 23 L.Ed.2d 583. See Comment, 83 Harv.L.Rev. 7, 80 (1969).

It is further ordered that this decision and decree shall operate prospectively as set forth in the Court's opinion (findings of fact and conclusions of law).