No. 24657.

Myron H. Pike, Fred E. Fogg and L. T. Zell v. School District No. 11 in El Paso County, Colorado, Robert Grimes, C. Lee Goodbar, Harlan Ochs, William Ruddy and John L. Wyman, Individually and in their capacity as Members of the Board of Education of School District No. 11 in El Paso County, Colorado, and Artie-Melia Davis Crawford, and The Colorado Springs Teachers Association, The Colorado Federation of Teachers and Helen Riordian.

(474 P.2d 162)

Decided August 31, 1970.    Rehearing denied September 21, 1970.

GIBSON, GIBSON, GERDES & CAMPBELL, FREDERICK H. CAMPBELL, for plaintiffs in error.

HORN, ANDERSON & JOHNSON, ROBERT E. ANDERSON, for defendants in error.

JOE A. CANNON, DAVID R. BARNHIZER, for intervenor in error.

HANEY, HOWBERT & AKERS, ROGER D. HUNT, for amici curiae.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

THIS was an action to have the result of a school district election declared invalid. The trial court denied relief and dismissed the action. We affirm.

The board of the school district involved, acting under 1969 Perm. Supp., C.R.S. 1963, 123-38-21, submitted to a

vote of the electors of the district the question of whether it should be authorized to increase the amount that might be expended for current expenses from the general fund during the ensuing budget year from $681.67 to $811.59 per pupil with resulting increase in the property tax rate from 44.61 mills to 48.09 mills. The cited statutory section and the sections immediately preceding it, being a part of the Public School Foundation Act of 1969, require approval of an increase of this magnitude by a majority vote of "the registered qualified taxpaying electors of the district" who shall vote. At the election held on December 9, 1969, the increase in per pupil expense and the mill levy were approved by a majority of 223 votes, 5,067 voting for and 4,844 against. Prior to the election counsel for the district board gave his opinion that the limitation of the franchise to "taxpaying electors" is unconstitutional under two recent decisions of the United States Supreme Court. These decisions are *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed 2d 583 and *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed. 2d 647, both of which were announced on June 16, 1969. This advice was followed and non-taxpaying electors were permitted to vote. The trial court found that the number of non-property owners voting was sufficient, mathematically, to change the results of the election.

The position of the plaintiffs in this action is: (1) that the statute should have been followed and only taxpaying electors permitted to vote; and (2) that, if the statutory limitation is unconstitutional, the word "taxpaying" is not severable from the rest of the statute and the entire statute must fall. In *Kramer v. Union Free School District, supra,* there was before the court a New York statute limiting the franchise in the annual election of members of the school boards in certain districts to parents and guardians of children attending public schools in the district, to residents who owned or leased taxable real property and to spouses of such residents.

The action to have the statute declared unconstitutional was brought by a bachelor who resided with his parents and neither owned nor leased taxable real property.

In the five to three majority opinion Chief Justice Warren declared that the statue unconstitutionally denied equal protection to Mr. Kramer. However, in the decision it was stated that no opinion was being expressed as to whether a state in some circumstances might limit the exercise of the elective franchise to those "primarily interested" or "primarily affected."

In the companion case of *Cipriano v. City of Houma, supra,* the court considered a Louisiana law which limited the franchise to "property taxpayers" in elections held for the approval of issuance of revenue bonds by a municipal utility. The limitation was held to be unconstitutional as violative of the equal protection clause. Further as stated in *Kramer,* when the state limits the election franchise the courts must determine whether the exclusions are necessary "to promote a compelling state interest."

Until June 23, 1970, we were free to affirm or reverse in the instant matter. We could follow *Stewart v. Parish School Board,* 310 F. Supp. 1172 (1970) and affirm; or we could subscribe to *Muench v. Paine,* 93 Idaho 473, 463 P.2d 939 (1970); *Settle v. City of Muskogee,* 462 P.2d 642 (Okla. 1969); and *Settle v. Board of County Commissioners,* 462 P.2d 646 (Okla. 1969). Each of these four cases involved a state statute which limited the vote to taxpayers in elections concerning bonds payable through tax levies. In *Stewart* it was held that the statute did not meet the standards of *Kramer* and *Cipriano* and, therefore, was unconstitutional. In *Muench* and the two *Settle* cases it was concluded that *Kramer* and *Cipriano* did not control and the statutory limitations were upheld. Both the Idaho and Oklahoma courts found that the limitation promoted a *compelling state interest.*

On June 23, 1970, the day after the plaintiffs in error filed their reply brief here, Mr. Justice White delivered

the five to three opinion in *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523. This was cited here in a supplemental brief and discussed in oral argument. Involved was an election to authorize the issuance of general obligation bonds, as well as certain revenue bonds. While under Arizona law property taxes were to be levied to service the indebtedness, the city was privileged to use other revenues for this purpose. The majority opinion held that the exclusion of non-property owners from the election under the Arizona statute violated the equal protection clause of the United States Constitution. Among the reasons given for that conclusion was that revenues other than property taxes were legally available to retire the bonds.

If *Kolodziejski* had been grounded solely on that proposition, we would be free, if we desired, to distinguish it from the election in the instant matter. However, the decision went much further. The three-judge court which originally heard *Kolodziejski* perceived no significant difference between revenue bonds and general obligation bonds. It held that the exclusion of nonproperty-owning voters under general obligation bonds was unconstitutional under *Kramer* and *Cipriano*. That holding was affirmed.

Further, in *Kolodziejski* the court stated:
"Concededly, the case of elections to approve general obligation bonds was not decided in *Cipriano v. City of Houma, supra.* But we have concluded that the principles of that case, and of *Kramer v. Union Free School District, supra*, dictate a like result where a State excludes nonproperty taxpayers from voting in elections for the approval of general obligation bonds."

Additionally, *Kolodziejski* holds that property owners and nonproperty owners alike have a sufficient interest in public facilities and services of the city to make unconstitutional the limitation of the elective franchise to property owners alone. Also, it found that property taxes

418

are normally passed on to tenants and that most non-property owners were tenants.

Plaintiff in error in oral argument advanced the suggestion that the availability of other funds to pay the bonds was the real basis for the decision in *Kolodziejski* and that the other statements therein which we have said are controlling are merely dicta. We cannot agree. We do not regard as dictum the interpretation of *Kramer* and *Cipriano*. The other grounds upon which the opinion is based are just as much controlling as the ground of availability of other funds.

We are unable to find sufficient distinguishing features between the municipal election in *Kolodziejski* and the budget and mill levy election here considered to avoid the controlling impact of *Kolodziejski*. We, therefore, are obliged to hold that the limitation of the right to vote in 1969 Perm. Supp., C.R.S. 1963, 123-38-21 is unconstitutional.

There is some passing significance to the following observation made by Judge Wisdom of the Fifth Circuit Court of Appeals in *Stewart v. Parish School Board, supra:*

"*Kramer* and *Cipriano*, with the aid of *Reynolds v. Sims, Avery,* and *Harper*, teach that laws restricting the right to vote — we say, in any election — do not carry the usual presumption of constitutionality."[1]

Considerable authority has been cited on both sides of the question of whether the word "taxpaying" in the statute is severable. Considerable and possibly very awkward confusion would result if we were to hold that "taxpaying" is not severable and declare the whole limitation and election portions of the statute unconstitutional. Therefore, we are persuaded that the better rule for application here is that the word is severable.

[1] *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964) ; *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed. 2d 45 (1968) ; *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966).

We follow the view of *School District No. 1 v. School Planning Comm.* 164 Colo. 541, 437 P.2d 787, that where a portion of a statute is unconstitutional, the remaining portions will be held valid if they are complete in themselves and can be given legal effect. This achieves (perhaps on a sounder foundation) the same result as arrived at in *Stewart v. Parish School Board, supra,* wherein it was said:

"We hold that the general election laws of Louisiana are to be applied in general obligation bond elections; all qualified registered voters are entitled to vote in such elections, as they are now entitled to vote in Louisiana revenue bond and sales tax elections."

■ We hold: that only the word "taxpaying" at all places in which it appears in 1969 Perm. Supp., C.R.S. 1963, 123-38-21 causes the unconstitutionality; that at all places in the section the word "taxpaying" is severable; and that the section is to be read as if the word did not appear therein.

This decision is to be applied prospectively only to elections held after the date this opinion becomes final and to those elections held prior to such date that are challenged within the time permitted by law.

Judgment affirmed.

MR. JUSTICE KELLEY dissenting.

MR. JUSTICE KELLEY dissenting:

I respectfully dissent from the decision of the court. My basic exception to the majority opinion relates to its cursory treatment and disposition of the issue of severability of "taxpaying."

The only authority cited in support of the majority's holding is *School District No. 1 v. School Planning Committee,* 164 Colo. 541, 437 P.2d 787. Perhaps inadvertently, the court employs part of the rule, but overlooks what is, to me, the important portion of the rule.

To illustrate my point, I quote from the cited case:

"* * * In such a situation, the remaining portions of the statute will be held valid if they are complete in themselves and can be given legal effect, *Home Owners' Loan Corporation v. Public Water Works District No. 2*, 104 Colo. 466, 92 P.2d 745 (1939); *and, if the invalid portion was not an essential, pervasive part of the Act. Four-County Metropolitan Improvement District v. Board of County Commissioners*, 149 Colo. 284, 369 P.2d 67 (1962) * * *." (Emphasis added.)

The majority quoted and relied upon that part of the rule preceding the semicolon. That portion of the rule which is underscored was completely ignored by the majority. Consequently, no consideration was given to the question of whether "taxpaying" was a *pervasive part* of the statute. The dictionary tells us that *pervasive* means "prevalent" or "dominant."

*Four County* relied on *Denver v. Lynch*, 92 Colo. 102, 18 P.2d 907. In *Lynch*, Mr. Justice Burke, writing for the majority, stated what I believe to be the almost universal rule of law as to severability:

"An act or statute may be constitutional in one part and unconstitutional in another, and, if severable, the invalid may be stricken and the valid left stand. 6 R.C.L., p. 121, § 121. *The power of the court to make such a decision rests primarily upon legislative intent.* If we may reasonably presume that the General Assembly would have passed this act with the commissioners eliminated and the sole power to fix the amount of the allowance vested in the county judge, we may thus emasculate, and thus sustain it. Id. p. 123, § 122. *If the invalid portion of an act was apparentliy an inducement to the passage of the valid, the statute is not severable.* Id p. 125 § 123. *Nor can an essential part of an act, which colors the whole, be stricken as invalid and the remainder sustained.* Id. p. 127, § 125." (Emphasis added.)

See, also: *Crawford v. City and County of Denver*, 156 Colo. 292, 398 P.2d 627; *Newman v. The People*, 23 Colo.

300, 47 P. 278; C.R.S. 1963, 135-1-5 (severability of statutes).

Thus, the visceral question as to whether "taxpaying" can be properly severed turns on the answer to the inquiry — would the general assembly have passed that portion of the school foundation act permitting the board of education to increase the general fund budget by an election at which other than "registered qualified taxpaying electors of the district" would be eligible to vote?

Some review of the public school foundation act of 1969 is essential to get the flavor — an understanding of what the general assembly had in mind in reference to the use of an election to increase the mill levy.

The general purpose of the school foundation legislation was to create a means and a formula whereby the state, with its various sources of revenue, other than ad valorem taxes, could share the burden of school support with the local school districts which were exclusively dependent upon real property taxes, so far as locally generated revenue was concerned, thereby, hopefully, enabling local school districts to avoid further burdening real property taxpayers. To this end the general assembly, in this act, appropriated $61,800,000 to provide the state's share of equalization support, plus other lesser amounts for specific school purposes. Section 27.

Parenthetically, before moving to specific provisions of the act, it should be noted that the only authority which a school board has to act is that specifically given to it by the constitution or by general law. It has no inherent power.

Senate Ball No. 127 of the 1969 session (the school foundation act) as introduced did not contain the limitation on the general fund budget (123-38-19) nor the provision authorizing the election procedure here in issue (123-38-21). In section 15, containing general provisions, subsection (3) provides:

"Nothing contained in this act shall affect or limit the

authority of any school district to make such other tax levies as are provided by law."

What happened to the bill, and more particularly this provision, as it proceeded through the legislature is most enlightening on the question of legislative intent and severability.

The senate committee on education amended Senate Bill 127 by adding the limitation on the general fund budget with this provision: (Section 21).

"(b) Should the board of education of any school district determine that its budgetary needs for the ensuing budget year exceed the one hundred six per cent of current expense per pupil in average daily attendance limitation, such board of education may submit a request to the state board of review for approval of an increase of not exceeding one hundred ten per cent of current expense per pupil in average daily attendance. The state board of review shall review the application thoroughly and it shall have authority to approve or disapprove the request. However, should the state board of review determine that the board of education of any school district, which spent less than the state average current expense per pupil in average daily attendance for the preceding school year, can increase its budgeted current expense per pupil in average daily attendance in excess of the one hundred and ten per cent limitation but only to the extent that such increase can be accomplished without increasing the property tax revenues of the district by more than ten per cent for current expense per pupil in average daily attendance, the state board of review may authorize an increase in the budgeted current expense per pupil in average daily attendance not to exceed one hundred and ten per cent of the state average current expense per pupil in average daily attendance for the preceding year."

This same committee amendment contains the first appearance of the provision for increasing the budget by an election. Section 23:

"(1) If the board of education of a school district shall

be of the opinion that a budget in excess of one hundred ten per cent of current expense per pupil in average daily attendance is necessary to provide for the needs of the district, or if the state board of review, pursuant to section 21 of this act, denies a request for an increase of more than one hundred six per cent of such current expense, the board may submit to the *registered qualified electors* of the district at a special election the question of whether and to what extent the board may exceed the limitations imposed pursuant to section 21 of this act. * * *." Senate Journal p. 686. (Emphasis added.)

Section 26 of the amended bill created a state board of review. It was given power "to approve or deny applications from school boards to increase the expenditures per pupil in average daily attendance in excess of six but not to exceed ten per cent over the current budget year." Section 27, Senate Journal p. 688.

These amendments were approved by the committee of the whole. However, the report of the committee of the whole was amended by inserting the word "taxpaying" after the word "qualified," so that "the" election was limited to "all registered qualified *taxpaying* electors of the district as defined in section 123-31-1, C.R.S. 1963, as amended * * *." Section 23(3)(b). (Emphasis added.)

When the bill reached the House, an attempt was made to amend section 21 by deleting "taxpaying." This effort failed.

The bill as finally enacted into law deleted the provision for the creation of the state review board and section 16(3) giving the school district authority to "make such other tax levies as are provided by law."

To me, it is clear that the insertion of "taxpaying" was a prime inducement to the passage of the balance of the act so far as it relates to the limitation on the budget and the method provided for increasing the amount thereof above the previous year's budget on a per pupil basis.

For this court to justify its determination that "tax-

paying" is severable because "considerable and possibly very awkward confusion would result" is judicial legislation and beyond the power of this court to attempt to remedy.

The court, feeling as it did that the position of the United States Court, as expressed in *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523, is irredeemable, should have held the election provision wholly invalid and laconically commented:

"Regrettable as the result of our conclusion may be, it is unavoidable, and its effect is greatly minimized by the fact that a regular session of the General Assembly will convene a few days hence, and such remedy may then be provided as in the wisdom of the lawmakers seems advisable." *Denver v. Lynch, supra.*

The history of the legislation suggests that had the general assembly thought it lacked the power to limit the vote to "taxpaying" electors, it could have chosen other avenues available to it. It could have placed an absolute ceiling on the amount of the increase, for example, 110% of the prior year's budget; or it could have delegated to a special board, such as the review board, the authority to grant increases up to a certain fixed percentage or to grant unlimited increases; or it could have limited the increases to specific purposes, such as teachers' salaries; or it could have provided that any increase in excess of 106%, for example, shall be allowed only upon the vote of a two-thirds vote of the board of education.

In *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583, the challenge to restrictive voting for school board members was raised by an otherwise qualified elector who was not a property taxpayer; in *Cipriano v. City of Houma,* 395 U.S. 701, 89, S.Ct. 1897, 23 L.Ed.2d 647, the challenge to restrictive voting was on the question of the issuance of revenue bonds, by an elector who was not a property taxpayer, and in *City of Phoenix, supra,* the challenge was by a non-taxpaying elector who had been denied the right to vote in a *bond*

election, where both ad valorem and general revenues would be used to pay off the bonds.

Here, the school district is challenging the right of the legislature to limit voting to taxpaying electors only where the school district proposes to increase its budget, on a *per pupil basis*, above 106% of the previous year's budget, and pay that *exclusively* from the revenue derived from the increase in the mill levy. This type of situation is fundamentally different from any other yet considered by the United States Supreme Court.

Under Colorado law, *all* qualified electors may vote for the members of the school board; the increase in the mill levy which is voted upon is not for physical facilities to be financed by the issuance of bonds payable over a period of ten to twenty years, but for operating expenses for one year where the *entire increase* is going to be paid from ad valorem revenue.

To me, the United State Supreme Court has not necessarily precluded a different result in a case involving our factual situation.

The opinion in *City of Phoenix* held,

"* * * our decision in this case will apply only to authorizations for general obligation bonds which are not final as of June 23, 1970, the date of this decision. In the case of States authorizing challenges to bond elections within a definite period, all elections held prior to the date of this decision will not be affected by this decision unless a challenge on the grounds sustained by this decision has been or is brought within the period specified by state law. In the case of States, including apparently Arizona, that do not have a well-defined period of bringing challenges to bond elections, all elections held prior to the date of this decision that have not yet been challenged on the grounds sustained in this decision prior to the date of this decision will not be open to challenge on the basis of our ruling in this case * * *."

The election here — *not a bond election* — was held December 9, 1969. The *City of Phoenix* decision was

issued June 23, 1970. No bonds were to be issued here. If the election had carried the mill levy procedure would have been completed long prior to June 23, 1970; *i.e.,* December 15, 1969. 1969 Perm. Supp., C.R.S. 1963, 123-3-2. Had the election failed, the levy could not have been made for 1969. A successful challenge would have enabled non-taxpaying electors to have voted in the 1970 election. This result does not seem to me to create "awkward confusion."

Perhaps the legislature contemplated the application of tight fiscal policies. If it did, we should not change its scheme by deleting "taxpaying" when it apparently regarded it as "pervasive." "Taxpaying electors" appear in many places in the constitution and throughout our statutes. Perhaps the general assembly and the people have given "taxpaying electors" more "voice" than they should have, but this is not a case for such a decision.

*City of Phoenix* has not expressly overruled *Kramer* and *Cipriano,* at least so far as leaving to the courts the determination of whether the exclusion of nontaxpaying electors is "necessary to promote a compelling state interest."

Finally, I do not approve of a policy that permits an *administrative body* to make a judicial determination which has the effect of invalidating many statutory and constitutional provisions of this state. I would let the United States Supreme Court tell us that neither the people nor their representatives can place restrictions on voting to further burden their property, under the enlightened school financing plan adopted in Colorado.