# SALYER LAND CO. ET AL. *v.* TULARE LAKE BASIN WATER STORAGE DISTRICT

No. 71–1456.   Argued January 8, 1973—Decided March 20, 1973

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 735.

*Thomas Keister Greer* argued the cause for appellants. With him on the briefs was *C. Ray Robinson.*

*Robert M. Newell* argued the cause for appellee. With him on the brief was *Ernest M. Clark, Jr.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This is another in the line of cases in which the Court has had occasion to consider the limits imposed by the Equal Protection Clause of the Fourteenth Amendment on legislation apportioning representation in state and local governing bodies and establishing qualifications for voters in the election of such representatives. *Reynolds* v. *Sims,* 377 U. S. 533 (1964), enunciated the constitutional standard for apportionment of state legislatures. Later cases such as *Avery* v. *Midland County,* 390 U. S. 474 (1968), and *Hadley* v. *Junior College District,* 397 U. S. 50 (1970), extended the *Reynolds* rule to the governing bodies of a county and of a junior college district, respectively. We are here presented with the issue expressly reserved in *Avery, supra:*

"Were the [county's governing body] a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents

---

*Melvin L. Wulf, Sanford Jay Rosen, Joel M. Gora,* and *David Hall* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Denslow Green* for Irrigation Districts Association of California, and by *George Basye* for California Central Valleys Flood Control Association.

more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the· organization's functions." 390 U. S., at 483–484.

The particular type of local government unit whose organization is challenged on constitutional grounds in this case is a water storage district, organized pursuant to the California Water Storage District Act, Calif. Water Code § 39000 *et seq.* The peculiar problems of adequate water supplies faced by most of the western third of the Nation have been described by Mr. Justice Sutherland, who was himself intimately familiar with them, in *California Oregon Power Co.* v. *Beaver Portland Cement Co.,* 295 U. S. 142, 156–157 (1935):

> "These states and territories comprised the western third of the United States—a vast empire in extent, but still sparsely settled. From a line east of the Rocky Mountains almost to the Pacific Ocean, and from the Canadian border to the boundary of Mexico—an area greater than that of the original thirteen states—the lands capable of redemption, in the main, constituted a desert, impossible of agricultural use without artificial irrigation.
>
> "In the beginning, the task of reclaiming this area was left to the unaided efforts of the people who found their way by painful effort to its inhospitable solitudes. These western pioneers, emulating the spirit of so many others who had gone before them in similar ventures, faced the difficult problem of wresting a living and creating homes from the raw elements about them, and threw down the gage of battle to the forces of nature. With imperfect tools, they built dams, excavated canals, constructed ditches, plowed and cultivated the soil, and trans-

formed dry and desolate lands into green fields and leafy orchards. . . ."

Californians, in common with other residents of the West, found the State's rivers and streams in their natural state to present the familiar paradox of feast or famine. With melting snow in the high mountains in the spring, small streams became roaring freshets, and the rivers they fed carried the potential for destructive floods. But with the end of the rainy season in the early spring, farmers depended entirely upon water from such streams and rivers until the rainy season again began in the fall. Long before that time, however, rivers which ran bank full in the spring had been reduced to a bare trickle of water.

It was not enough therefore, for individual farmers or groups of farmers to build irrigation canals and ditches which depended for their operation on the natural flow of these streams. Storage dams had to be constructed to impound in their reservoirs the flow of the rivers at flood stage for later release during the dry season regimen of these streams. For the construction of major dams to facilitate the storage of water for irrigation of large areas, the full resources of the State and frequently of the Federal Government were necessary.[1]

But for less costly projects which would benefit a more restricted geographic area, the State was frequently either unable or unwilling to pledge its credit or its resources. The California Legislature, therefore, has authorized a number of instrumentalities, including water storage districts such as the appellee here, to provide a local response to water problems.

Some history of the experience of California and the other Western States with the problems of water distri-

---

[1] The history of the vast Central Valley Project in California is recounted in *United States* v. *Gerlach Live Stock Co.*, 339 U. S. 725 (1950).

bution is contained in *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112, 151–154 (1896), in which the constitutionality of California's Wright Act was sustained against claims of denial of due process under the Fourteenth Amendment to the United States Constitution. While the irrigation district was apparently the first local governmental unit authorized to deal with water distribution, it is by no means the only one. General legislation in California authorizes the creation, not only of irrigation districts, but of water conservation districts, water storage and conservation districts, flood control districts, and water storage districts such as appellee.[2]

Appellee district consists of 193,000 acres of intensively cultivated, highly fertile farm land located in the Tulare Lake Basin. Its population consists of 77 persons, including 18 children, most of whom are employees of one or another of the four corporations that farm 85% of the land in the district.

Such districts are authorized to plan projects and execute approved projects "for the acquisition, appropriation, diversion, storage, conservation, and distribution of water . . . ." Calif. Water Code § 42200 *et seq.*[3] Incidental to this general power, districts may "acquire, improve, and operate" any necessary works for the stor-

---

[2] 4 Waters and Water Rights § 345.3 (R. Clark ed. 1970).

[3] The actual adoption of district projects is long and involved. After a district undertakes a project, it must be approved by the California Department of Water Resources. Calif. Water Code § 42200 *et seq.* A report and the estimated cost of the project must be submitted to the California State Treasurer, who undertakes an independent investigation before declaring the project abandoned or approving the report. *Id.*, § 42275 *et seq.* If the report is approved, a "special election" is called. *Id.*, § 42325 *et seq.* In order for the project to be finally adopted, a majority of the votes and a majority of the voters must approve it. *Id.*, §§ 42355–42550.

age and distribution of water as well as any drainage or reclamation works connected therewith, and the generation and distribution of hydroelectric power may be provided for.[4] *Id.*, §§ 43000, 43025. They may fix tolls and charges for the use of water and collect them from all persons receiving the benefit of the water or other services in proportion to the services rendered. *Id.*, § 43006. The costs of the projects are assessed against district land in accordance with the benefits accruing to each tract held in separate ownership. *Id.*, §§ 46175, 46176. And land that is not benefited may be withdrawn from the district on petition. *Id.*, § 48029.

Governance of the districts is undertaken by a board of directors. *Id.*, § 40658. Each director is elected from one of the divisions within the district, *id.*, § 39929, and each must take an official oath and execute a bond. *Id.*, § 40301. General elections for the directors are to be held in odd-numbered years. *Id.*, §§ 39027, 41300 *et seq.*

It is the voter qualification for such elections that appellants claim invidiously discriminates against them and persons similarly situated. Appellants are landowners, a landowner-lessee, and residents within the area included in the appellee's water storage district. They brought this action under 42 U. S. C. § 1983, seeking declaratory and injunctive relief in an effort to prevent appellee from giving effect to certain provisions of the California Water Code. They allege that §§ 41000 [5] and 41001 [6] unconstitutionally deny to them the equal pro-

---

[4] There is no evidence that the appellee district engages in the generation, sale, or distribution of hydroelectric power.

[5] Calif. Water Code § 41000 provides:

"Only the holders of title to land are entitled to vote at a general election."

[6] Calif. Water Code § 41001 provides:

"Each voter may vote in each precinct in which any of the land owned by him is situated and may cast one vote for each one hundred

tection of the laws guaranteed by the Fourteenth Amendment, in that only landowners are permitted to vote in water storage district general elections, and votes in those elections are apportioned according to the assessed valuation of the land. A three-judge court was convened pursuant to 28 U. S. C. § 2284, and the case was submitted on factual statements of the parties and briefs, without testimony or oral argument. A majority of the District Court held that both statutes comported with the dictates of the Equal Protection Clause, and appellants have appealed that judgment directly to this Court under 28 U. S. C. § 1253.

In *Williams* v. *Rhodes,* 393 U. S. 23 (1968), a case in which the Ohio legislative scheme for regulating the electoral franchise was challenged, the Court said:

> "[T]his Court has firmly established the principle that the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution. But we have also held many times that 'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause. In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." *Id.,* at 30.

We therefore turn now to the determination of whether the California statutory scheme establishing water storage districts violates the Equal Protection Clause of the Fourteenth Amendment.

---

dollars ($100), or fraction thereof, worth of his land, exclusive of improvements, minerals, and mineral rights therein, in the precinct."

## I

It is first argued that § 41000, limiting the vote to district landowners, is unconstitutional since nonlandowning residents have as much interest in the operations of a district as landowners who may or may not be residents. Particularly, it is pointed out that the homes of residents may be damaged by floods within the district's boundaries, and that floods may, as with appellant Ellison, cause them to lose their jobs. Support for this position is said to come from the recent decisions of this Court striking down various state laws that limited voting to landowners, *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970), *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), and *Kramer* v. *Union School District,* 395 U. S. 621 (1969).

In *Kramer,* the Court was confronted with a voter qualification statute for school district elections that limited the vote to otherwise qualified district residents who were either (1) the owners or lessees of taxable real property located within the district, (2) spouses of persons owning qualifying property, or (3) parents or guardians of children enrolled for a specified time during the preceding year in a local district school. Without reaching the issue of whether or not a State may in some circumstances limit the exercise of the franchise to those primarily interested or primarily affected by a given governmental unit, it was held that the above classifications did not meet that state-articulated goal since they excluded many persons who had distinct and direct interests in school meeting decisions and included many persons who had, at best, remote and indirect interests. *Id.,* at 632–633.

Similarly, in *Cipriano* v. *City of Houma, supra,* decided the same day, provisions of Louisiana law which gave only property taxpayers the right to vote in elec-

tions called to approve the issuance of revenue bonds by a municipal utility were declared violative of the Equal Protection Clause since the operation of the utility systems affected virtually every resident of the city, not just the 40% of the registered voters who were also property taxpayers, and since the bonds were not in any way financed by property tax revenue. 395 U. S., at 705. And the rationale of *Cipriano* was expanded to include general obligation bonds of municipalities in *Phoenix* v. *Kolodziejski, supra.* It was there noted that not only did those persons excluded from voting have a great interest in approving or disapproving municipal improvements, but they also contributed both directly through local taxes and indirectly through increased rents and costs to the servicing of the bonds. 399 U. S., at 210–211.

*Cipriano* and *Phoenix* involved application of the "one person, one vote" principle to residents of units of local governments exercising general governmental power, as that term was defined in *Avery* v. *Midland County,* 390 U. S. 474 (1968). *Kramer* and *Hadley* v. *Junior College District,* 397 U. S. 50 (1970), extended the "one person, one vote" principle to school districts exercising powers which,

> "while not fully as broad as those of the Midland County Commissioners, certainly show that the trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in *Avery* should also be applied here." 397 U. S., at 53–54.

But the Court was also careful to state that:

> "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal gov-

728

ernmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds, supra,* might not be required, but certainly we see nothing in the present case that indicates that the activities of these trustees fit in that category. Education has traditionally been a vital governmental function, and these trustees, whose election the State has opened to all qualified voters, are governmental officials in every relevant sense of that term." *Id.,* at 56.

We conclude that the appellee water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the rule laid down in *Reynolds* which the quoted language from *Hadley, supra,* and the decision in *Avery, supra,* contemplated.

The appellee district in this case, although vested with some typical governmental powers,[7] has relatively limited authority. Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin.[8] It provides no other general public

---

[7] The board has the power to employ and discharge persons on a regular staff and to contract for the construction of district projects. Calif. Water Code § 43152. It can condemn private property for use in such projects, *id.,* §§ 43530–43533, and may cooperate (including contract) with other agencies, state and federal. *Id.,* § 43151. Both general obligation bonds and interest-bearing warrants may be authorized. *Id.,* §§ 44900–45900.

[8] Appellants strongly urge that districts have the power to, and do, engage in flood control activities. The interest of such activities to residents is said to be obvious since houses may be destroyed and, as in the case of appellant Ellison, jobs may disappear. But Calif. Water Code § 43151 provides that any agreement entered into with the State or the United States must be "for a purpose appertaining to or beneficial to the project of the district. . . ." And the statute which assertedly gives support to the flood control activities, *id.,*

services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body. App. 86. There are no towns, shops, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains. *Ibid.*

Not only does the district not exercise what might be thought of as "normal governmental" authority, but its actions disproportionately affect landowners. All of the costs of district projects are assessed against land by assessors in proportion to the benefits received. Likewise, charges for services rendered are collectible from persons receiving their benefit in proportion to the services. When such persons are delinquent in payment, just as in the case of delinquency in payments of assessments, such charges become a lien on the land. Calif. Water Code §§ 47183, 46280. In short, there is no way that the economic burdens of district operations can fall on residents *qua* residents, and the operations of the districts primarily affect the land within their boundaries.[9]

Under these circumstances, it is quite understandable that the statutory framework for election of directors

§ 44000, simply states that a district "may cooperate and contract with the state . . . or the United States" for the purpose of "flood control." *Id.*, § 44001. Thus, any flood control activities are incident to the exercise of the district's primary functions of water storage and distribution.

[9] Appellants point out that since the flood of 1969, the district has received about $250,000 in flood relief funds from the Federal Government and that the residents, like other American citizens, have paid their share of that money and are therefore entitled to vote. Cf. *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970). But their status as district residents bears no more relation to the flood relief money than that of any other·United States citizen and would seem to provide no more compelling reason for granting such residents the right to vote than the citizenry at large.

of the appellee focuses on the land benefited, rather than on people as such. California has not opened the franchise to all residents, as Missouri had in *Hadley, supra,* nor to all residents with some exceptions, as New York had in *Kramer, supra.* The franchise is extended to landowners, whether they reside in the district or out of it, and indeed whether or not they are natural persons who would be entitled to vote in a more traditional political election. Appellants do not challenge the enfranchisement of nonresident landowners or of corporate landowners for purposes of election of the directors of appellee. Thus, to sustain their contention that all residents of the district must be accorded a vote would not result merely in the striking down of an exclusion from what was otherwise a delineated class, but would instead engraft onto the statutory scheme a wholly new class of voters in addition to those enfranchised by the statute.

We hold, therefore, that the popular election requirements enunciated by *Reynolds, supra,* and succeeding cases are inapplicable to elections such as the general election of appellee Water Storage District.

## II

Even though appellants derive no benefit from the *Reynolds* and *Kramer* lines of cases, they are, of course, entitled to have their equal protection claim assessed to determine whether the State's decision to deny the franchise to residents of the district while granting it to landowners was "wholly irrelevant to achievement of the regulation's objectives," *Kotch* v. *River Port Pilot Comm'rs,* 330 U. S. 552, 556 (1947). No doubt residents within the district may be affected by its activities. But this argument proves too much. Since assessments imposed by the district become a cost of doing business for those who farm within it, and that

cost must ultimately be passed along to the consumers of the produce, food shoppers in far away metropolitan areas are to some extent likewise "affected" by the activities of the district. Constitutional adjudication cannot rest on any such "house that Jack built" foundation, however. The California Legislature could quite reasonably have concluded that the number of landowners and owners of sufficient amounts of acreage whose consent was necessary to organize the district would not have subjected their land to the lien of its possibly very substantial assessments unless they had a dominant voice in its control. Since the subjection of the owners' lands to such liens was the basis by which the district was to obtain financing, the proposed district had as a practical matter to attract landowner support. Nor, since assessments against landowners were to be the sole means by which the expenses of the district were to be paid, could it be said to be unfair or inequitable to repose the franchise in landowners but not residents. Landowners as a class were to bear the entire burden of the district's costs, and the State could rationally conclude that they, to the exclusion of residents, should be charged with responsibility for its operation. We conclude, therefore, that nothing in the Equal Protection Clause precluded California from limiting the voting for directors of appellee district by totally excluding those who merely reside within the district.

### III

Appellants assert that even if residents may be excluded from the vote, lessees who farm the land have interests that are indistinguishable from those of the landowners. Like landowners, they take an interest in increasing the available water for farming and, because the costs of district projects may be passed on to them

either by express agreement or by increased rentals, they have an equal interest in the costs.

Lessees undoubtedly do have an interest in the activities of appellee district analogous to that of landowners in many respects. But in the type of special district we now have before us, the question for our determination is not whether or not we would have lumped them together had we been enacting the statute in question, but instead whether "if any state of facts reasonably may be conceived to justify" California's decision to deny the franchise to lessees while granting it to landowners. *McGowan* v. *Maryland*, 366 U. S. 420, 426 (1961).

The term "lessees" may embrace the holders of a wide spectrum of leasehold interests in land, from the month-to-month tenant holding under an oral lease, on the one hand, to the long-term lessee holding under a carefully negotiated written lease, on the other. The system which permitted a lessee for a very short term to vote might easily lend itself to manipulation on the part of large landowners because of the ease with which such landowners could create short-term interests on the part of loyal employees. And, even apart from the fear of such manipulation, California may well have felt that landowners would be unwilling to join in the forming of a water storage district if short-term lessees whose fortunes were not in the long run tied to the land were to have a major vote in the affairs of the district.

The administration of a voting system which allowed short-term lessees to vote could also pose significant difficulties. Apparently, assessment rolls as well as state and federal land lists are used by election boards in determining the qualifications of the voters. Calif. Water Code § 41016. Such lists, obviously, would not ordinarily disclose either long- or short-term leaseholds.

While reference could be made to appropriate conveyancing records to determine the existence of leases which had been recorded, leases for terms less than one year need not be recorded under California law in order to preserve the right of the lessee. Calif. Civil Code § 1214.

Finally, we note that California has not left the lessee without remedy for his disenfranchised state. Sections 41002 and 41005 of the California Water Code provide for voting in the general election by proxy. To the extent that a lessee entering into a lease of substantial duration, thereby likening his status more to that of a landowner, feels that the right to vote in the election of directors of the district is of sufficient import to him, he may bargain for that right at the time he negotiates his lease. And the longer the term of the lease, and the more the interest of the lessee becomes akin to that of the landowner, presumably the more willing the lessor will be to assign his right. Just as the lessee may by contract be required to reimburse the lessor for the district assessments so he may by contract acquire the right to vote for district directors.

Under these circumstances, the exclusion of lessees from voting in general elections for the directors of the district does not violate the Equal Protection Clause.

## IV

The last claim by appellants is that § 41001, which weights the vote according to assessed valuation of the land, is unconstitutional. They point to the fact that several of the smaller landowners have only one vote per person whereas the J. G. Boswell Company has 37,825 votes, and they place reliance on the various decisions of this Court holding that wealth has no relation to resident-voter qualifications and that equality of voting power may not be evaded. See, *e. g., Gray* v. *Sanders,*

372 U. S. 368 (1963); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966).

Appellants' argument ignores the realities of water storage district operation. Since its formation in 1926, appellee district has put into operation four multi-million-dollar projects. The last project involved the construction of two laterals from the Basin to the California State Aqueduct at a capital cost of about $2,500,000. Three small landowners having land aggregating somewhat under four acres with an assessed valuation of under $100 were given one vote each in the special election held for the approval of the project. The J. G. Boswell Company, which owns 61,665.54 acres with an assessed valuation of $3,782,220 was entitled to cast 37,825 votes in the election. By the same token, however, the assessment commissioners determined that the benefits of the project would be uniform as to all of the acres affected, and assessed the project equally as to all acreage. Each acre has to bear $13.26 of cost and the three small landowners, therefore, must pay a total of $46, whereas the company must pay $817,685 for its part.[10] Thus, as the District Court found, "the benefits and burdens to each landowner . . . are in proportion to the assessed value of the land." 342 F. Supp. 144, 146. We cannot say that the California legislative decision to permit voting in the same proportion is not rationally based.

Accordingly, we affirm the judgment of the three-judge District Court and hold that the voter qualification statutes for California water storage district elections

---

[10] As was pointed out in n. 3, small landowners are protected from crippling assessments resulting from district projects by the dual vote which must be taken in order to approve a project. Not only must a majority of the votes be cast for approval, but also a majority of the voters must approve. In this case, about 189 landowners constitute a majority and 189 of the smallest landowners in the district have only 2.34% of the land.

are rationally based, and therefore do not violate the Equal Protection Clause.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting.

The vices of this case are fourfold.

*First.* Lessees of farmlands, though residents of the district, are not given the franchise.

*Second.* Residents who own no agricultural lands but live in the district and face all the perils of flood which the district is supposed to control are disfranchised.

*Third.* Only agricultural landowners are entitled to vote and their vote is weighted, one vote for each one hundred dollars of assessed valuation as provided in § 41001 of the California Water Code.

*Fourth.* The corporate voter is put in the saddle.

There are 189 landowners who own up to 80 acres each. These 189 represent 2.34% of the agricultural acreage of the district. There are 193,000 acres in the district. Petitioner Salyer Land Co. is one large operator, West Lake Farms and South Lake Farms are also large operators. The largest is J. G. Boswell Co. These four farm almost 85% of all the land in the district. Of these, J. G. Boswell Co. commands the greatest number of votes, 37,825, which are enough to give it a majority of the board of directors. As a result, it is permanently in the saddle. Almost all of the 77 residents of the district are disfranchised. The hold of J. G. Boswell Co. is so strong that there has been no election since 1947, making little point of the provision in § 41300 of the California Water Code for an election every other year.

The result has been calamitous to some who, though landless, have even more to fear from floods than the ephemeral corporation.

## I

In *Phoenix* v. *Kolodziejski,* 399 U. S. 204, 209, we set out the following test for state election schemes which selectively distribute the franchise:

"Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise."

Provisions authorizing a selective franchise are disfavored, because they "always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives." *Kramer* v. *Union School District,* 395 U. S. 621, 627. In order to overcome this strong presumption, it had to be shown up to now (1) that there is a compelling state interest for the exclusion, and (2) that the exclusions are necessary to promote the State's articulated goal. *Phoenix* v. *Kolodziejski, supra; Cipriano* v. *City of Houma,* 395 U. S. 701; *Kramer* v. *Union School District, supra.* See also *Police Jury of Vermillion Parish* v. *Hebert,* 404 U. S. 807; *Stewart* v. *Parish School Board of St. Charles,* 310 F. Supp. 1172, aff'd, 400 U. S. 884. In my view, appellants in this case have made a sufficient showing to invoke the above principles, and the presumption thus established has not been overcome.

Assuming, *arguendo,* that a State may, in some circumstances, limit the franchise to that portion of the electorate "primarily affected" by the outcome of an election, *Kramer* v. *Union School District, supra,* at 632, the limitation may only be upheld if it is demonstrated that "all those excluded are in fact substantially less interested or affected than those the [franchise] includes." *Ibid.* The majority concludes that "there is no way that the

economic burdens of district operations can fall on residents *qua* residents, and the operations of the districts primarily affect the land within their boundaries."

But, with all respect, that is a great distortion. In these arid areas of our Nation a water district seeks water in time of drought and fights it in time of flood. One of the functions of water districts in California is to manage flood control. That is general California statutory policy.[1] It is expressly stated in the Water Code that governs water districts.[2] The California Supreme Court ruled some years back that flood control and irrigation are different but complementary aspects of one problem.[3]

From its inception in 1926, this district has had repeated flood control problems. Four rivers, Kings, Kern, Tule, and Kaweah, enter Tulare Lake Basin. South of Tulare Lake Basin is Buena Vista Lake. In the past, Buena Vista has been used to protect Tulare Lake Basin by storing Kern River water in the former. That is how Tulare Lake Basin was protected from menacing floods in 1952. But that was not done in the great 1969 flood, the result being that 88,000 of the 193,000 acres in respondent district were flooded. The board of the respondent district—dominated by the big landowner J. G. Boswell Co.—voted 6–4 to table the motion that would put into operation the machinery to divert the flood waters to the Buena Vista Lake. The reason is that J. G. Boswell Co. had a long-term agricultural lease in the Buena Vista Lake Basin and flooding it would have interfered with the planting, growing, and harvesting of crops the next season.

The result was that water in the Tulare Lake Basin rose to 192.5 USGS datum. Ellison, one of the appellants

---

[1] Calif. Stat. 1921, c. 914, § 58.

[2] Calif. Water Code § 44001.

[3] *Tarpey* v. *McClure*, 190 Cal. 593, 213 P. 983.

who lives in the district, is not an agricultural land-owner. But his residence was 15½ feet below the water level of the crest of the flood in 1969.

The appellee district has large levees; and if they are broken, damage to houses and loss of life are imminent.

Landowners—large or small, resident or nonresident lessees or landlords, sharecroppers [4] or owners—all should have a say. But irrigation, water storage, the building of levees, and flood control, implicate the entire community. All residents of the district must be granted the franchise.

This case, as I will discuss below, involves the performance of vital and important governmental functions by water districts clothed with much of the paraphernalia of government. The weighting of votes according to one's wealth is hostile to our system of government. See

---

[4] Since 1938, sharecroppers have been included in federal regulations defining "farmers" who are entitled to vote on referenda concerning marketing quotas under the Agricultural Adjustment Act.

"*Farmers engaged in the production of a commodity.* For purposes of referenda with respect to marketing quotas for tobacco, extra long staple cotton, rice and peanuts the phrase 'farmers engaged in the production of a commodity' includes any person who is entitled to share in a crop of the commodity, or the proceeds thereof because he shares in the risks of production of the crop as an owner, landlord, tenant, or sharecropper (landlord whose return from the crop is fixed regardless of the amount of the crop produced is excluded) on a farm on which such crop is planted in a workmanlike manner for harvest: *Provided,* That any failure to harvest the crop because of conditions beyond the control of such person shall not affect his status as a farmer engaged in the production of the crop. In addition, the phrase 'farmers engaged in the production of a commodity' also includes each person who it is determined would have had an interest as a producer in the commodity on a farm for which a farm allotment for the crop of the commodity was established and no acreage of the crop was planted but an acreage of the crop was regarded as planted for history acreage purposes under the applicable commodity regulations." 7 CFR § 717.3 (b).

*Stewart* v. *Parish School Board of St. Charles,* 310 F. Supp. 1172, aff'd, 400 U. S. 884. As a nonlandowning bachelor was held to be entitled to vote on matters affecting education, *Kramer* v. *Union School District, supra,* so all the prospective victims of mismanaged flood control projects should be entitled to vote in water district elections, whether they be resident nonlandowners, resident or nonresident lessees, and whether they own 10 acres or 10,000 acres. Moreover, their votes should be equal regardless of the value of their holdings, for when it comes to performance of governmental functions all enter the polls on an equal basis.

The majority, however, would distinguish the water storage district from "units of local government having general governmental powers over the entire geographic area served by the body," *Avery* v. *Midland County,* 390 U. S. 474, 485, and fit this case within the exception contemplated for "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." *Id.,* at 483–484. The *Avery* test was significantly liberalized in *Hadley* v. *Junior College District,* 397 U. S. 50. At issue was an election for trustees of a special-purpose district which ran a junior college. We said,

> "[S]ince the trustees can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college, their powers are equivalent, for apportionment purposes, to those exercised by the county commissioners in *Avery.* . . . [T]hese powers, while not fully as broad as those of the Midland County Commissioners, certainly show that the trustees *perform important governmental functions . . .* and have *suffi-*

*cient impact throughout the district* to justify the conclusion that the principle which we applied in *Avery* should also be applied here." *Id.,* at 53–54. (Emphasis added; footnote omitted.)

Measured by the *Hadley* test, the Tulare Lake Basin Water Storage District surely performs "important governmental functions" which "have sufficient impact throughout the district" to justify the application of the *Avery* principle.

Water storage districts in California are classified as irrigation, reclamation, or drainage districts.[5] Such state agencies "are considered exclusively governmental," and their property is "held only for governmental purpose," not in the "proprietary sense."[6] They are a "public entity," just as "any other political subdivision."[7] That is made explicit in various ways. The Water Code of California states that "[a]ll waters and water rights" of the State "within the district are given, dedicated, and set apart for the uses and purposes of the district."[8] Directors of the district are "public officers of the state."[9] The district possesses the power of eminent domain.[10] Its works may not be taxed.[11] It carries a governmental immunity against suit.[12] A district has powers that relate to irrigation, storage of water, drainage, flood control, and generation of hydroelectric energy.[13]

Whatever may be the parameters of the exception alluded to in *Avery* and *Hadley,* I cannot conclude that

---

[5] Calif. Water Code § 39060.

[6] *Glenn-Colusa Irrigation District* v. *Ohrt,* 31 Cal. App. 2d 619, 623, 88 P. 2d 763, 765.

[7] Calif. Govt. Code § 811.2.

[8] Section 43158. See also *id.,* § 39061.

[9] *In re Madera Irrigation District,* 92 Cal. 296, 322, 28 P. 272, 278.

[10] Calif. Water Code § 43530.

[11] *Id.,* § 43508.

[12] Calif. Govt. Code §§ 811.2, 815.

[13] Calif. Water Code §§ 42200, 43000, 43025, 44001.

this water storage district escapes the constitutional restraints relative to a franchise within a governmental unit.

## II

When we decided *Reynolds* v. *Sims*, 377 U. S. 533, and discussed the problems of malapportionment we thought and talked about people—of population, of the constitutional right of "qualified citizens to vote," (*id.*, at 554) of "the right of suffrage," (*id.*, at 555) of the comparison of "one man's vote" to that of another man's vote. *Id.*, at 559. We said:

> "Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." *Id.*, at 562.

It is indeed grotesque to think of corporations voting within the framework of political representation of people. Corporations were held to be "persons" for purposes both of the Due Process Clause of the Fourteenth Amendment [14] and of the Equal Protection Clause.[15] Yet, it is unthinkable in terms of the American tradition that corporations should be admitted to the franchise. Could a State allot voting rights to its corporations, weighting each vote according to the wealth of the corporation? Or could it follow the rule of one corporation, one vote?

---

[14] *Minneapolis & St. Louis R. Co.* v. *Beckwith*, 129 U. S. 26, 28.

[15] *Pembina Consolidated Silver Mining & Milling Co.* v. *Pennsylvania*, 125 U. S. 181, 188–189; *Santa Clara County* v. *Southern Pacific R. Co.*, 118 U. S. 394, 397.

It would be a radical and revolutionary step to take, as it would change our whole concept of the franchise. California takes part of that step here by allowing corporations to vote in these water district matters [16] that entail performance of vital governmental functions. One corporation can outvote 77 individuals in this district. Four corporations can exercise these governmental powers as they choose, leaving every individual inhabitant with a weak, ineffective voice. The result is a corporate political kingdom undreamed of by those who wrote our Constitution.

---

[16] Calif. Water Code § 41004.