Robert LYTLE, Appellee,

v.

COMMISSIONERS OF ELECTION OF UNION COUNTY et al., Appellants.

Thomas C. McCAIN et al., Appellees,

v.

Charles E. LYBRAND et al., Appellants.

No. 74–1619.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1974.

Decided June 17, 1974.

Certiorari Denied Nov. 25, 1974. See 95 S.Ct. 515.

**1050**

C. Tolbert Goolsby, Jr., Deputy Atty. Gen. of S. C., Karen LeCraft Henderson, Asst. Atty. Gen. of S. C. (Daniel R. McLeod, Atty. Gen. of S. C., Bruce W. White, Union County Atty., and Charles W. Coleman, Edgefield County Atty., on brief), for appellants.

David Ross Clarke and James Jacobsen, Mauldin, S. C., for appellee Robert Lytle.

Armand Derfner, Charleston, S. C. (Epstein & McClain, Charleston, S. C., Laughlin McDonald, Morris Brown, Atlanta, Ga., Emily Carssow, Athens, Ga., and Neil Bradley, Atlanta, Ga., on brief), for appellees Edgefield County.

Before CRAVEN, RUSSELL and FIELD, Circuit Judges.

PER CURIAM:

The plaintiffs in these two cases challenge the constitutional validity of the statutory provisions for the election of the members of the Boards of Control[1] of Union and Edgefield Counties, South Carolina.[2] In both Counties the members of these governing Boards are elected at large but each member must reside in separate fixed districts of the County. The districts vary in population—substantially so in Union County—and in classification between urban and rural. Because both actions involved the same legal principles, they were consolidated for hearing and were disposed of in a single decree in the District Court and have been heard in this Court together.

In its decree, the District Court held that, since the several districts in the two Counties were "of unequal proportion" in population and "finding neither rational nor compelling circumstances justifying the formation of the unequally populated districts", the residency requirements for members of the two Boards were "violative of the 'one-man, one-vote' principle and are constitutionally unacceptable." It granted the Counties until May 1, 1975 to enact a plan for the election of the members of the two Boards that would comply with the constitutional standards as it had stated them and ordered by way of temporary relief that the nomination and election of such members for the currently slated 1974 election be at large without any residency requirements. In order to make effective this latter remedy, it ordered reopened the filing date of candidates for nomination in the party primaries to be held on July 16, 1974.

The defendants have appealed and, in connection therewith, have sought from the District Court a stay of its order pending disposition on the merits. When that application was denied, they applied to this Court for a stay under Rule 8(a), F.R.A.P. At the hearing on the motion to stay, it was agreed that the motion for a stay and a hearing of the appeal on the merits could be appropriately heard

---

1. The Board of Township Commissioners and County Supervisor constitute "the governing board of Union County." § 14–3464, Code of Laws of South Carolina, 1962, as amended by 52 Stat. Act No. 860 at 2152 (1962).

   The County Council is the governing body of Edgefield County. 57 Stat. Act No. 521 at 989 (1971).

2. 338 S. C. Joint Acts and Resolutions 555, as amended; and 14–1850, Code of Laws of South Carolina, 1962, as amended.

together and a determination on the merits would be dispositive of the motion to stay. We proceed accordingly to a consideration of the merits of the controversy.

The Supreme Court has not decreed absolute rigidity in the application of the "one man, one-vote" rule as enunciated in Wesberry v. Sanders (1964) 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481, and succeeding cases, to elections to public office at all levels of federal and state government. In congressional elections, for instance, "only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown" are constitutionally permissible. Kirkpatrick v. Preisler (1969) 394 U.S. 526 at 531, 89 S.Ct. 1225, at 1229, 22 L.Ed.2d 519. Recognizing that such a rule of equal representation could not be automatically applied to local government, and, if applied, might "impair the normal functioning of state and local governments", the Court substantially relaxed the rule of mathematical exactness for the election of state legislators in Mahan v. Howell (1973) 410 U.S. 315, at 323, 93 S.Ct. 979, at 984, 35 L.Ed.2d 320. In so doing, it accepted the argument that "maintaining the integrity of political subdivision lines" in such elections "is a rational one" and will justify some departure from the rule adopted in Preisler of congressional elections.[3] The "absolute rule" of Preisler has been even further relaxed by the Court in its review of the constitutionality of representational structures at the strictly local governmental level, such as is involved in this case. Cf., Salyer Land Co. v. Tulare Water District (1973) 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659. In these circumstances it was accepted that "each citizen's constitutional right to equal representation must be reconciled with the need for flexibility in designing local structures." Note, 72 Mich.L.Rev. 869 (1974). Accordingly, in Dusch v. Davis (1967) 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656, it was held that local government officials elected at large may validly be required to be residents of particular areas or districts within the local governmental unit, even though such areas or districts have wide populational variances. Such decision recognized the wisdom of creating an institutional framework of local government that would assure "that councilmen with knowledge of the particular problems of each of the heterogeneous boroughs would be serving on the council." Note, 81 Harv.L.Rev. 154. And, because the local unit had a mixed economic base, the guaranty of regional representation under a system of equal voting represented "a sound compromise between urban and rural interests at the local level"[4] and, just as the maintenance of "the integrity of political subdivision lines" provided a rational basis for the population variances in Mahan, so this attempt to balance urban and rural interests provided a rational basis for the addition of the residence requirement for candidates under a plan of at-large voting. Such a plan does not violate the rationale of the "one-man, one-vote" cases. Its residence requirement constitutes only a basis for qualification of candidates, not for voting or representation.[5] What it seeks is the avoidance of

3. 410 U.S. at 329, 93 S.Ct. 979.

4. 81 Harv.L.Rev. 155.

This idea was expressed by the Court itself in these words [387 U.S. at 117, 87 S.Ct. at 1556]:

"The Seven-Four Plan seems to reflect a detente between urban and rural communities that may be important in resolving the complex problems of the modern megalopolis in relation to the city, the suburbia, and the rural countryside."

5. For a recent statement of the value of the residency requirement in situations such as is present here. See Bilzin, Reapportionment in the Sub-State Level of Government: Equal Representation or Equal Vote, 50 Boston U.L. Rev. 231, 251:

"The problems involved in creating effective representation involve more than merely shifting numbers; the use of techniques such as residency requirements may prove beneficial. Members elected under this type of requirement tend to be men of broader backgrounds, more accessible to their constituencies, better informed and more sensitive to the needs of the various districts than those who are not."

that "uniform straitjacket * * * in devising mechanisms of local government suitable for local needs and efficient in solving local problems", deplored in *Avery*.[6] As a matter of fact, the members, elected at-large, are answerable to and are representative of the entire constituency. The value of the residency provision, though, is that it provides an additional mechanism whereby territorial interests may be articulated through a representative who, though elected by the voters of the County as a whole, has a unique awareness and understanding of the problems and interest of the subdivision. This is a legitimate interest to be considered in fashioning a plan of local government.

■ Of course, there are limits to this electoral flexibility for local governmental units. When the residential areas are so drawn as to make it possible for the minority in numbers, whether it be urban or rural, to control the governing board, such an arrangement will transcend the constitutional bounds authorized under *Dusch*. The heart of *Dusch* is its approval of a "rational" balancing of interests, with appropriate regard for the distribution of population, in the constituency of the local governing board. It assumes the fairness of a scheme that allows some force to territorial interests, but at the same time it requires that the accommodation of territorial interests shall not nullify what are the proper rights of the majority in population. Accordingly, if the plan of election arbitrarily overbalances rural over urban or *vice versa*, judicial remedy is available. It was because of such a situation that an earlier plan involving the governmental unit in *Dusch* was judicially disapproved and the "Seven-Four" plan was devised.

■ The plaintiffs assert that any plan that detracts in any particular from an absolute rule both for voting and for residence of candidates is invalid. In the context of fixing the structures of local governmental units there may be relaxation of the absolute rule, if the reason therefor is as stated in *Mahan*, "rational". An attempt through a residency requirement to strike a balance between the interests of the rural and urban areas in a county, provided voting rights for both areas are protected by at-large elections, meets the "rational" test. The plaintiffs, however, argue that if the defendants wish to support the residency requirement by this type of balancing, they are obligated to assert such claim affirmatively in their pleadings and to sustain it with proof. They contend the defendants have made no such affirmative showing. However, it is obvious from an official map of the two counties and the listing of the populations in the several districts of the political units that there are urban and rural areas fairly well defined in the counties involved. Thus, Union district, with over 58% of the County's population qualifies as an urban area; similarly, Goshen Hill district, with a population of 561, would be fairly characterized as agricultural. These are merely common-sense deductions from admitted facts. It thus takes no elaborate record to establish what is so manifestly obvious and what is actually inherent in the plaintiffs' own argument; *i. e.*, that the several plans deal with and seek to establish some sort of accommodation between urban and rural interests. *Dusch* declares such an attempt at adjustment between varying interests in a local unit is "rational" and valid.

■ It remains to ascertain whether the residential requirements for representation as devised in the statutes under review represent a proper constitutional balance of these urban and rural interests. To determine this, we must examine the workings of the plan in each county separately. So examined, we conclude the plan followed in Union County will not meet constitutional standards. There is no "Seven-Four" plan here such as there was in *Dusch*.

6. Avery v. Midland County, Texas (1968), 390 U.S. 474 at 485, 88 S.Ct. 1114 at 1120, 20 L.Ed.2d 45.

The urban area as represented by the Union district, with, as we have observed, 58% of the County's population, is entitled to but a single resident member on the eight-man Board. Stated more particularly, Union district, with a population of 17,127, and Goshen Hill district, with a population of 561, would, under the statute challenged, have the same residential representation on the Board of County Control. There are no "floating" members as in *Dusch* to compensate for the very substantial variations in population among the districts. The District Court properly, therefore, found under these circumstances that the statutory plan of selection in Union County was invalid.

It does not follow, however, that, because the present statutory scheme in Union County is invalid, the proper temporary or transitional remedy is the complete invalidation of the residence requirement for the approaching election, while affording the legislature an opportunity to develop its own plan between now and 1975. After all, there is an obligation on the Court to fashion even its transitional remedy by taking into consideration what obviously was the legislative purpose in devising the plan it did and to depart as little from that purpose as constitutional principles will permit. To strike down completely all residence requirements would mean that the urban area of Union could completely dominate and control the Board, leaving the rural areas of the County without any representative to voice their peculiar and unique territorial interests. That was a result the legislature manifestly sought to avoid. In decreeing transitional relief, the Court should not disregard that legislative purpose. Accordingly, the remedy adopted should be one that recognizes and gives proper effect to the population variances among the districts as well as the economic differences among them. It was the virtue of the *Dusch* plan that it did exactly that. It accomplished that result by requiring a number of "floater" representatives, without any residence require-

ments, while retaining a certain number of representatives with residence requirements. Under the plan, the urban areas, which represented the majority in population, could conceivably achieve a numerical majority on the Board but the rural areas, despite their minority in population, were assured reasonable representation for the representation of their interests on the Board. That, it seems to us, should be the transitional remedy ordered in the Union case. A "Four-Four" plan is readily adaptable to the situation and will achieve the same kind of fairness as resulted from the plan approved in *Dusch*. Specifically, four members of the Board would be nominated and elected without residence requirements and four would be elected with residence requirements. The resident requirement for the latter four would contemplate that the eight districts in the County should be grouped by combining two districts and by providing that each such group of two districts should be entitled to have as a member of the Board one of its residents, elected, of course, by the voters of the entire County. In making the groupings, the most populous district might first be coupled with the least populous, and in the subsequent groupings, the same procedure of joining the most populous district then remaining with the least populous would be followed. This is purely a suggestion and the parties are at liberty to submit any alternative plan to the District Court that may be deemed consonant with the principles set forth herein, provided they act promptly and do not delay unduly the electoral processes.

This remedy, it should be observed, is only decreed for the approaching election. It is not intended to be a permanent plan for the election of the members of the Board. A permanent plan should be a legislative responsibility and only in default of any valid legislative action should the judiciary interfere. It should be remarked, too, that there is no claim of any racial discrimination

**1054**

claimed to result from the present statutory plan.

As a result of our modification of the plan adopted by the District Court for the approaching election, it will be necessary to provide for the reopening of the election machinery for the election of members of this Board in Union County. To the end that this may be done promptly and expeditiously, this cause will be remanded to the District Court to enter such administrative orders as may be appropriate and, in order that such Court may not be delayed in discharging this responsibility, the mandate herein shall issue forthwith.

So far, we have dealt only with the Union County plan. We are of the opinion that the Edgefield County plan, as presently provided by statute, represents a proper balancing of interests and without such population variances among the districts as to require the deletion on constitutional grounds of the residence requirements imposed by the statute under attack. There is not the wide disparity in population among the districts as was the case in Union County. It is not obvious that a minority, either in numbers or in territorial or economic interest, can dominate the Board. The several districts are of sufficient size and numbers that a residence requirement does not appear to be an irrational method of achieving a form of county government, elected by all the voters of the County but, through its residence requirement, assuming some attention to territorial interests. We conclude, therefore, that the District Court was in error in invalidating the statutory election procedure for the members of the Edgefield County Board.

The decree of the District Court invalidating the statutory provisions for the election of members of the governing board of Union County is accordingly affirmed, but the transitional remedy for use at the current election of members of such Board is reversed, and the cause is remanded to the District Court with directions for the entry of an order for transitional or temporary relief as hereinbefore stated.

The decree of the District Court invalidating the statutory provisions governing the election of members of the Edgefield County Council is reversed.

Affirmed in part and reversed in part.