No. 53,760

D. WILLIAM PROVANCE, *Plaintiff-Appellee,* v. SHAWNEE MISSION UNIFIED SCHOOL DISTRICT NO. 512, *et al., Defendants-Appellees,* v. JACK BALSINGER and RONALD G. BLECKE, *Defendants-Appellants.*

(648 P.2d 710)

Opinion filed July 16, 1982.

*Norman E. Gaar,* of Gaar & Bell, of Kansas City, Missouri, argued the cause and *Lori S. Klarfeld,* of Mission, was on the brief for the defendants-appellants.

*James R. Orr,* of Bennett, Lytle, Wetzler, Winn & Martin of Prairie Village, argued the cause and *John L. Vratil,* of the same firm, was with him on the brief for the defendants-appellees.

*D. William Provance,* of Shawnee Mission, argued and was on the brief *pro se.*

The opinion of the court was delivered by

HERD, J.: This is an appeal from the district court's decision holding this State's school closing statutes, K.S.A. 72-8136a *et seq.,* in part unconstitutional.

The Shawnee Mission Unified School District No. 512 is a political subdivision of the State located in Johnson County. Pursuant to K.S.A. 72-8127 the Board of Education has divided the school district into five geographical areas, or member districts, North, South, East, West and Northwest. The Board of Education is comprised of seven members, one of whom is

elected from each of the member districts, and the other two are elected at large from the entire school district.

The Antioch Elementary School is located within the North member district of the entire school district. Prior to school unification in 1969, the school was owned and operated by Common School District No. 61. Those who live within the boundaries of old school district No. 61 are still subject to a property tax levy which is used to help retire the continuing bonded indebtedness of Common School District No. 61. On September 22, 1980, the Superintendent of Schools of the Shawnee Mission School District recommended to the Board of Education that Antioch Elementary School be closed at the end of the 1980-81 school term. After consideration of the factors outlined in K.S.A. 72-8136b the Board adopted a resolution stating its tentative intention to approve the recommendation of the Superintendent and close the school. On December 17, 1980, after a public hearing, the Board made a final decision to close Antioch Elementary School at the end of the 1980-81 school year.

In accordance with K.S.A. 72-8136e(b) a petition in proper form was submitted to the Johnson County Election Commissioner demanding that a referendum election be held on the issue of the closing of Antioch Elementary School. That election was held on April 7, 1981, at which time the forces in favor of keeping the school open won a narrow victory.

In determining who could vote in the April 7 referendum the school district followed K.S.A. 72-8136e(b) and (c) which provide in pertinent part:

"(b) . . . All registered electors residing within the member district of the unified school district in which the affected attendance facility is located may vote at the election. The board shall not close any affected attendance facility pending any election to be held under the provisions of this section. If a majority of those voting at such election are not in favor of closing the affected attendance facility the same shall not be closed. If a majority of the votes at such election are in favor of closing the affected attendance facility, the board may close the affected attendance facility at the conclusion of the current school year.

"(c) In the event the attendance area in which the affected attendance facility is located consists of territory which is located in more than one member district of the school district, the registered electors residing in any precinct or precincts in which any portion of the attendance area which is outside the member district in which the affected attendance facility is located shall be eligible to sign the petition and to vote at the election provided for by subsection (b) of this section."

The attendance area of Antioch Elementary School is located in both north and west member districts. Persons residing in Ward 1, Precinct 11, of the City of Overland Park are the non-residents of north member district who are entitled to vote on the school closing. Thus, pursuant to K.S.A. 72-8136e(*b*) and (*c*), all registered voters residing in north member district or Ward 1, Precinct 11, were eligible to vote in the school closing election. The following map illustrates the situation:

SHAWNEE MISSION SCHOOL DISTRICT

☐ Area in which residents permitted to vote in April 7, 1981, election on issue of closing Antioch Elementary School.

— — — Boundary of former Common School District No. 61

•••••• Attendance area for Antioch Elementary School

★ Antioch Elementary School

✦ Plaintiff's residence

The appellee resides in the northwest area of the school district, approximately 2.7 miles from Antioch Elementary School. Consequently, he was not allowed to vote in the referendum. Prior to

the election he filed a petition seeking a declaratory judgment the school closing statutes were unconstitutional because of the manner in which they limited participation in school closing referenda. He also sought an injunction prohibiting the continued operation of Antioch School, solely on the basis of the results of the referendum and a writ of mandamus directing the School Board to conduct all elections held pursuant to K.S.A. 72-8136e on a district-wide basis. Finally, he demanded an award of attorney fees and court costs.

The appellee consented to allow the referendum to be held, subject to the trial court's determination regarding its validity. After trial the court held K.S.A. 72-8136e unconstitutional in part as violative of the 14th Amendment to the U.S. Constitution. Appellee's request for attorney fees was, however, denied. This appeal followed.

Initially, we must deal with the question of whether the trial court erred in allowing appellants to intervene below. Originally, the trial court permitted Jack Balsinger and Ronald Blecke to intervene for the purpose of filing an *amicus curiae* brief. In announcing the decision at trial, however, the court granted Balsinger and Blecke leave to intervene with "the same rights and privileges of the original defendants, including the right to seek appellate review of this decision." Appellee argues the trial court abused its discretion in allowing appellants to intervene.

K.S.A. 60-224 states in part:

"(b) *Permissive intervention.* Upon timely application anyone may be permitted to intervene in an action: (1) When a statute confers a conditional right to intervene; or (2) when an appellant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

"(c) *Motion to intervene and practice an intervention.* (1) A person desiring to intervene shall serve a motion to intervene upon the parties as provided in K.S.A. 60-205. The motion shall state the grounds therefor, and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute of this state gives a right to intervene. (2) When the validity of a statute, regulation or constitutional provision of this state, or an ordinance or regulation of a governmental subdivision thereof affecting the public interest, is drawn in question in any action to which the state or governmental subdivision or an officer, agency or employee thereof is not a party, the court may in its discretion notify the chief legal officer of the state or subdivision thereof affected, and permit intervention on proper application."

K.S.A. 60-224 is patterned after Fed. R. Civ. P. 24. In 7A Wright & Miller, Federal Practice and Procedure: Civil § 1913, pp. 341-42 (1981 Supp.), the rule is discussed as follows:

"In making a discretionary decision on the issue of permissive intervention, the district court should consider the nature and extent of the intervenors' interest, their standing to raise legal relevant issues, the legal position they seek to advance and its probable relation to the merits of case, whether changes have occurred in the litigation so that intervention that was once denied should be reexamined, whether the intervenors' interests are adequately represented by other parties, whether intervention will prolong or unduly delay the litigation, and whether the parties seeking intervention will significantly contribute to the full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented."

Here appellants complied with the statute. They filed and served a motion alleging they were residents of the Antioch school attendance center area and attached an answer wherein they asserted their defenses to the action. Further, appellants have a substantial interest in the outcome of the controversy because of their status as property taxpayers residing in the Antioch Elementary School attendance area. Their intervention has not and will not prolong or unduly delay the litigation. Appellants' claim involved the same question of law at the main action, but raised no new issues of law. Finally, the original defendant, Shawnee Mission School District No. 512, has chosen not to appeal the trial court's determination. In light of these factors the trial court did not err in allowing appellants to intervene.

The central issue in this case is whether the Shawnee Mission School District, under the direction of a state statute, violated appellee's 14th Amendment right to equal protection by prohibiting him from voting on the closing of Antioch Elementary School.

When ruling on the constitutionality of a statute, this court's duty is clear.

"Constitutionality is presumed, all doubts must be resolved in favor of the statute's validity, and before a statute may be stricken down it must be clearly shown it violates the constitution. It is the court's duty to uphold the statute under challenge, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *State ex rel. Stephan v. Martin,* 230 Kan. 747, 641 P.2d 1011 (1982); *State ex rel. Schneider v. Kennedy,* 225 Kan. 13, 20-21, 587 P.2d 844 (1978); *City of Wichita v. Kansas Corporation Commission,* 225 Kan. 524, 527, 592 P.2d 880 (1979); *Rogers v.*

*Shanahan,* 221 Kan. 221, 223, 565 P.2d 1384 (1976); *Brown v. Wichita State University,* 219 Kan. 2, Syl. ¶ 3, 547 P.2d 1015 (1976)." *Von Ruden v. Miller,* 231 Kan. 1, 3, 642 P.2d 91 (1982).

Pursuant to K.S.A. 72-8136e the school district created a classification. In one group were those registered voters who lived in the north member district or Ward 1, Precinct 11, of Overland Park. In another were all other registered voters in the school district. These two classes were treated differently in that the former group was allowed to vote in the Antioch School referendum while the latter was not. The question, then, is whether the unequal treatment resulting from the school district's classification amounts to a denial of equal protection.

Of particular importance in any equal protection analysis is the determination of what level of scrutiny should be employed in examining the governmental classification. Appellees rely heavily on *Kramer v. Union School District,* 395 U.S. 621, 23 L.Ed.2d 583, 89 S.Ct. 1886 (1969), for their argument this court should strictly scrutinize the classification here. At issue in *Kramer* was a New York voter qualification statute that limited the vote in school district elections to otherwise qualified district residents who (1) either owned or leased taxable real property located within the district, (2) were married to persons owning or leasing qualified property, or (3) were parents or guardians of children enrolled in a local district school for a specified time during the preceding year. The court held the statute denied equal protection because it was not necessary to promote a compelling state interest.

The "compelling state interest" standard, as it has come to be called, is applied whenever the classification interferes with the exercise of a fundamental right under the Constitution. See, *e.g., Memorial Hospital v. Maricopa County,* 415 U.S. 250, 39 L.Ed.2d 306, 94 S.Ct. 1076 (1974); *Dunn v. Blumstein,* 405 U.S. 330, 31 L.Ed.2d 274, 92 S.Ct. 995 (1972); *Shapiro v. Thompson,* 394 U.S. 618, 22 L.Ed.2d 600, 89 S.Ct. 1322 (1969). We agree the right to vote for elected representatives is fundamental "because statutes distributing the franchise constitute the foundation of our representative society." *Kramer,* 395 U.S. at 626. There is a difference, however, when the issue involves the right to vote in a limited special purpose referendum. In *Hill v. Stone,* 421 U.S. 289, 297, 44 L.Ed.2d 172, 95 S.Ct. 1637, *reh. denied* 422 U.S.

1029 (1975), the Supreme Court recognized this difference when it stated:

"[A]s long as the election in question is not one of special interest, any classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest."

When a special interest election is involved the traditional standard of equal protection analysis is utilized. Such a standard requires only that classifications bear some rational relationship to a legitimate state end. A violation of the Equal Protection Clause will be found only if the classifications are based on reasons totally unrelated to the pursuit of that goal. *McGowan v. Maryland,* 366 U.S. 420, 6 L.Ed.2d 393, 81 S.Ct. 1101 (1961). The rational relationship test has been applied by the Supreme Court in holding a water district could constitutionally have a board of directors selected in an election where votes were allocated according to the assessed valuation of each voter's land (*Salyer Land Co. v. Tulare Water District,* 410 U.S. 719, 35 L.Ed.2d 659, 93 S.Ct. 1224 [1973]), and in upholding a voting scheme for a water reclamation district in Arizona, in which eligibility to vote for the district's directors was limited to landowners and apportioned according to the amount of land each voter owned. *Ball v. James,* 451 U.S. 355, 68 L.Ed.2d 150, 101 S.Ct. 1811 (1981).

The Supreme Court also employed the rational relationship test in *Lockport v. Citizens For Community Action,* 430 U.S. 259, 51 L.Ed.2d 313, 97 S.Ct. 1047 (1977). There a New York statute provided a new county charter could go into effect only if it was approved in a referendum by separate majorities of the voters who lived in the cities within the county and those who lived outside cities but within the county. In the challenged referendum the city voters approved the new charter but the non-city voters did not. The court upheld the law and recognized the difference between an "election involving the choice of legislative representatives" and a " 'single-shot' referendum. In a referendum," it said, "the expression of voter will is direct, and there is no need to assure that the voters' views will be adequately represented through their representatives in the legislature." *Lockport,* 430 U.S. at 266.

As in *Lockport,* unlike *Kramer,* this case involves a " 'single-shot' referendum" at which the voters spoke directly. Further,

this case involves an election which is likely to be of special interest to a particular, well-defined portion of the electorate. See *Hill v. Stone*, 421 U.S. 289. Our political process is one peculiarly suited to compromise and experimentation. Compromise, however, requires flexibility. If all voting restrictions must be justified by a compelling state interest that flexibility would be lost. We hold the "rational relationship" test is the proper standard to apply in the case at bar.

The determinative step in an equal protection analysis is to consider whether the particular classification in question is rationally related to a legitimate state end. In reaching a decision it is necessary to examine the purpose behind K.S.A. 72-8136e(*b*) and (*c*), the statutory sections creating the classification.

During the 1977 session of the legislature House Bill 2320 was offered as a response to declining enrollment in the Shawnee Mission school district. The bill gave the school board sole authority to close schools in the district. Opposition to the bill in that form developed from patrons who wanted more say in the decision to close schools. During consideration by the Senate Education Committee, Senator Gaar offered compromise amendments. The Gaar amendments formed the basis of K.S.A. 72-8136e(*b*) and (*c*) as they now stand.

The legislative history of the statute in question demonstrates K.S.A. 72-8136e was a creature of compromise. It was a legislative response to the need to develop a workable policy regarding school closings while at the same time giving due consideration to wishes of the voters. Alternatively, the legislature could have: 1) Given the school board sole authority to close schools; 2) allowed electors in the entire Shawnee Mission school district to vote on the closing of every school; 3) permitted only those registered to vote in the particular school's attendance area to vote on the question; or 4) included those in the pre-unification school district in which the particular school was located as voters.

The ultimate State purpose in offering a system of public schools is to provide an environment where quality education can be afforded equally to all. In pursuance of this ultimate goal a workable plan to allow the closing of schools when enrollments decline is needed. K.S.A. 72-8136e was an attempt to meet the legitimate State purpose of providing that workable plan while also insuring equality of education. It may not have been the best

possible scheme but that is not the question before us. For example, it is argued all registered voters living in old Common School District No. 61 should have been allowed to vote because money from the sale of Antioch Elementary School would be used to help retire that district's bonded indebtedness, thereby reducing property taxes. This might well have been a proper response to the problem, although the interest of those residents of district No. 61 who were not allowed to vote in the referendum is at best speculative due to the absence of any statutory requirement the money from the sale of Antioch School be used to retire the old district's bonded debt. Our concern here, however, is only whether the statute involved bears a rational relationship to the previously noted legitimate state ends. We hold it does. In light of the problem presented and the alternatives available, K.S.A. 72-8136e was a reasonable compromise which gave both the school board and the voters a voice in the decision.

In light of this holding appellee's cross-appeal regarding attorney fees need not be discussed.

The judgment of the district court is reversed. The April 7, 1981, referendum was valid.